IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN FLYNN, et. al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-0752 (RMU) |
| | ) | |
| WATERBURY MASONRY & FOUNDATION, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MOTION FOR ENTRY OF DEFAULT JUDGMENT
## AND INCORPORATED MEMORANDUM IN SUPPORT THEREOF

Plaintiffs, by their attorneys, and in accordance with Federal Rule of Civil Procedure 55(b)(2), move this Court to enter a default judgment in favor of the Plaintiffs and against Defendant in the amount of $18,457.31 on the ground that default has been entered against Defendant for failure to answer the Complaint of Plaintiffs.  This motion is supported by the Declarations of David F. Stupar, attached hereto as Exhibit A, and Ira R. Mitzner, attached hereto as Exhibit B.  The certificate of the Clerk of this Court declaring Defendant in default is attached hereto as Exhibit C.  A copy of the Complaint filed by Plaintiffs is attached hereto as Exhibit D.  A proposed Judgment is also attached hereto.

## FACTS

Plaintiffs, John Flynn, et al., filed the Complaint in this case on April 30, 2008. On May 6, 2008, Waterbury Masonry & Foundation, Inc. ("Waterbury Masonry") was served with the Summons and Complaint. Defendant has failed to file an Answer to the Complaint. On June 10, 2008, default was entered by the Clerk of this Court against Defendant, Waterbury Masonry.

## ARGUMENT

Rule 55 of the Federal Rules of Civil Procedure provides that when a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, the clerk shall enter the party's default and "the party entitled to a judgment by default shall apply to the court therefor." Defendant has failed to answer the Complaint, default has been entered by the Clerk, and Plaintiffs are entitled to judgment. Accordingly, Plaintiffs' motion for a default judgment should be granted. *See, e.g.*, *Trustees of the Local 306, United Ass'n. Health & Welfare Fund v. Am. Testing & Inspection, Inc.*, No-88-2274-OG, 1988 WL 134942, *1 (D. D.C. Nov. 30, 1988) (entering default judgment where "defendant has failed to respond at any step of these proceedings or otherwise enter an appearance"); *Sanderford v. Prudential Ins. Co. of Am.*, 902 F.2d 897, 901 (11th Cir. 1990) (affirming entry of default judgment as "[n]either the text of the Federal Rules, nor judicial interpretation placed in the rules by the Federal Courts contemplate that a party may totally ignore pleadings and notices it receives").

As stated further in the Declarations of David F. Stupar and Ira R. Mitzner, attached hereto as Exhibits A and B, Defendants owe the Plaintiffs a total amount of $18,457.31 in delinquent contributions, interest and additional interest on those contributions, audit fees and attorney's fees.

2

DSMDB-2469841

## CONCLUSION

For the foregoing reasons, a default judgment in favor of Plaintiffs and against Defendant in the amount of $18,457.31 should be entered.

Date: August 29, 2008                    Respectfully submitted,

                                         By _____
                                            Ira R. Mitzner (D.C. Bar #184564)
                                            Charles V. Mehler III (D.C. Bar #475909)
                                            DICKSTEIN SHAPIRO LLP
                                            1825 Eye Street, N.W.
                                            Washington, DC  20006
                                            (202) 420-2234

                                         Counsel for Plaintiffs

DSMDB-2469841

**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JOHN FLYNN, et. al.,<br><br>Plaintiffs,<br><br>v.<br><br>WATERBURY MASONRY & FOUNDATION, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 08-0752 (RMU) |

## DECLARATION OF DAVID F. STUPAR IN SUPPORT
## OF PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT

Pursuant to 28 U.S.C. § 1746, I, **DAVID F. STUPAR**, hereby declare as follows:

1.      I am the Executive Director of the Bricklayers & Trowel Trades International Pension Fund ("IPF" or "Fund") and am also an authorized representative to effect collections on behalf of the International Masonry Institute ("IMI") as specified in the General Collection Procedures of the Central Collection Unit ("CCU") of the Bricklayers and Allied Craftworkers ("Collection Procedures" or "Procedures") (attached as Exhibit 1). I have personal knowledge of the facts stated herein and, if called to testify as a witness, I could and would competently testify as set forth below.

2.      The IPF is a multiemployer employee benefit plan subject to ERISA. The IPF is governed by an equal number of employer-appointed and union-appointed Trustees, pursuant to the Taft-Hartley Act. Benefits under the plan are funded by contributions from participating employers.

3.      The Fund provides pension and other benefits to employees who work in the construction industry under contracts negotiated between Bricklayer local unions and employers.

Pursuant to these contracts, the employers are obligated to make contributions to the Fund in order to fund the benefits provided to the beneficiaries. The Trustees of the Fund have a fiduciary duty under ERISA to collect delinquent employer contributions, and the Trustees can be held personally liable for their failure to do so. 29 U.S.C. §§ 1104, 1109, 1132(g)(2). The Fund is administered in the District of Columbia.

4. The Trustees adopted the CCU Collection Procedures governing the collection of employer contributions and reports.

5. Under these Procedures, contributions and reports are due on or before the 15th day of the month ("Due Date") following the month in which work is performed. Once contributions are delinquent, the Procedures authorize the assessment of interest at 15 percent per annum and an additional amount, the greater of 15 percent per annum or 20 percent of the delinquent contributions, in the form of an additional computation of interest or liquidated damages.

6. I am familiar with the account of Waterbury Masonry & Foundation, Inc. ("Waterbury Masonry").

7. Waterbury Masonry, acting through its authorized agent or officer, signed a collective bargaining agreement ("Agreement") with the Connecticut District Council, International Union of Bricklayers and Allied Craftworkers, AFL-CIO ("Local 93 CT"). This Agreement obligated Defendant to submit monthly reports and payments to the IPF and IMI for covered work performed by its employees pursuant to the foregoing Procedures.

8. Waterbury Masonry has performed work in the geographic jurisdiction of Local 93 CT, which is covered by the Agreement.

2

2469193

9. Upon information and belief, Waterbury Masonry has failed to properly submit required reports and contributions for hours worked pursuant to the collective bargaining agreement it signed. Plaintiffs have therefore conducted two audits of Waterbury Masonry's books and records.

10. An examination of Waterbury Masonry's books and records performed by the independent accounting firm of Buckley, Frame, Boudreau & Co., P.C., covering the time period of January 2002 through June 2005, revealed that Waterbury Masonry failed to properly submit required reports and fringe benefit contributions for covered work performed during this time period within the geographic jurisdiction of the Local 93 CT.

11. As determined by this audit of Waterbury Masonry, the total due the IPF and IMI by Waterbury Masonry for covered work performed within the geographic jurisdiction of Local 93 CT by Waterbury Masonry and/or its subcontractors during the period of January 2002 through June 2005 is $12,443.35, which represents contributions, interest, additional interest and audit fees.

12. An additional examination of Waterbury Masonry's books and records performed by the independent accounting firm of Buckley, Frame, Boudreau & Co., P.C., covering the time period of January 2005 through December 2006, revealed that Waterbury Masonry failed to properly submit required reports and fringe benefit contributions for covered work performed during this time period within the geographic jurisdiction of the Local 93 CT.

13. As determined by the second audit of Waterbury Masonry, the total due the IPF and IMI by Waterbury Masonry for covered work performed within the geographic jurisdiction of Local 93 CT by Waterbury Masonry and/or its subcontractors during the period of

2469193

January 2005 December 2006 is $3,356.61, which represents contributions, interest, additional interest and audit fees.

14.    The court fee of $350.00 for filing this action is recoverable under ERISA Section 502(g)(2)(D), 29 U.S.C. § 1132(g)(2)(D), and the terms of the Collection Procedures.

15.    The process server's cost of $166.85 for serving the summons and Complaint on Defendant is recoverable under ERISA Section 502(g)(2)(D), 29 U.S.C. § 1132(g)(2)(D), and the terms of the Collection Procedures.

16.    Attorney's fees of $2,140.50, which are recoverable under ERISA Section 502(g)(2)(D), 29 U.S.C. § 1132(g)(2)(D), and the terms of the Collection Procedures, have been incurred by the Plaintiffs in their attempt to recover the delinquent contributions detailed above and to conduct audits on Defendant's books and records.  An accounting of the attorney's fees incurred in this action is presented in the Declaration of Ira R. Mitzner, counsel to the IPF, which accompanies this Motion for Default Judgment.

17.    The total amount owed the IPF and IMI by Defendant in audited and estimated delinquent contributions for the months of January 2002 through December 2006, as set forth above, interest and additional interest on such delinquent contributions owed the IPF and IMI (calculated at the rate of 15 percent per annum from the Due Date), court filing fee, process server's fee and attorney's fees is $18,457.31.

I declare under penalty of perjury that the foregoing is true and correct.

Date: July _____, 2008
August 22, 2008

David F. Stupar
Executive Director

4

2469193

**EXHIBIT 1**

5/13/02

# GENERAL COLLECTION PROCEDURES OF
## THE CENTRAL COLLECTION UNIT OF
### THE BRICKLAYERS AND ALLIED CRAFTWORKERS

These General Collection Procedures govern the collection of delinquencies by the Central Collection Unit of the Bricklayers and Allied Craftworkers ("CCU") on behalf of the following participating entities: Bricklayers and Allied Craftworkers International Union ("BAC"); Bricklayers and Trowel Trades International Pension Fund ("IPF"); Bricklayers and Allied Craftworkers International Health Fund ("IHF"); International Masonry Institute ("IMI"); Bricklayers and Allied Craftworkers Political Action Committee ("BACPAC"); and Local Officers and Employees Pension Fund ("LOEPF") (collectively "CCU Entities"). IHF and BAC SAVE are covered by Special Collection Procedures. Such Special Collection Procedures shall control when in conflict with these General Procedures.

I.  REPORTS AND PAYMENTS TO CCU ENTITIES

    A.  Due Date

        1.  Contributions and reports to the CCU Entities are due on or before the 15th day of the month following the month for which the contributions are being paid ("Due Date"), unless the collective bargaining agreement imposes a different Due Date.

        2.  Reports of participating employers must be filed each month even if no contributions are due for that month. All participating employers, whether submitting contributions directly or through a local administrator or local union, must use the standard CCU report form.

        3.  Employer reports will be date-stamped on the day received in the CCU Office, or in the case of local administrators or local unions, on the day received by the local. The stamped date will be the controlling date with regard to these Collection Procedures.

        4.  If any controlling date under these Collection Procedures falls on a weekend or legal holiday, the applicable date will be the next working day.

5.   The IPF is authorized by other CCU Entities to act on their behalf in litigation. All references to "CCU Office" in these Collection Procedures may also refer to "IPF Office," as applicable.

B.   Notice Of Delinquency

1.   If the CCU Office has not received payment by the last day of the month of the Due Date, the CCU Office will send a Reminder Notice to the employer. If payment has not been received 30 days after the Reminder Notice, a Notice of Delinquency will be sent to the employer.

2.   The Notice of Delinquency will advise the employer that required contributions were not received by the Due Date and warn that if the contributions are not received within 15 days (60 days following the Due Date), the employer will be considered delinquent ("Delinquent Date") and will be assessed interest at 15% per annum (retroactive to the Due Date) and may be required to pay Liquidated Damages of 20% of the delinquent amount. The Notice of Delinquency will require the employer to notify the CCU Office within five (5) days of the date of notice if the employer believes that the Notice of Delinquency was sent in error.

C.   Notice Of Referral To Counsel

1.   If the CCU Office has not received payment within 15 days of the Notice of Delinquency, the CCU Office will send to the employer a Notice of Referral to Counsel.

2.   The Notice of Referral to Counsel will advise the employer that payments were not received by the Delinquent Date and that payments for contributions and interest are due and owing. Unless all sums owed are received by the CCU Office within 10 days following the Notice of Referral to Counsel, liquidated damages up to 20% of the delinquent contributions or statutory interest may be imposed and the matter automatically will be referred to counsel. The Notice of Referral to Counsel also will state that counsel will be instructed to seek all sums recoverable, including contributions, interest, liquidated damages or statutory interest, and all attorneys' fees.

2

II.    COUNSEL

A.    Procedures

1.    If CCU has not received the contributions and applicable interest within 10 days of the Notice of Referral to Counsel, the matter automatically will be referred to counsel no later than 15 days from the due date.

2.    Within 10 days of referral, counsel will send a letter to the employer advising that if payment of contributions, interest and other damages is not received within 10 days, suit will be instituted.

3.    Suit thereafter will be instituted.

B.    CCU Policy Following Referral To Counsel

1.    Following the referral of a matter to counsel, the CCU Office will have no authority to deal with an employer except to discuss computations.

2.    Counsel shall file suit for all moneys recoverable, including damages that may be recoverable under Section 502(g)(2) of ERISA and also may seek remedies under applicable state law against individual corporate officers and/or shareholders.

3.    The CCU is authorized to seek legal redress prior to the time that the above procedures are exhausted if, in his sole discretion, the Director concludes that the interests of affected participants require immediate action. If an employer fails to make payment when due, suit may be filed to collect all delinquent contributions, interest and other damages regardless of other exhaustion requirements in these Collection Procedures.

III.    AUDITS

Audits will be conducted to insure full compliance with employer obligations under collective bargaining agreements. Every employer can expect to be audited at some time. If a delinquency is discovered as the result of an audit, the employer will be assessed the cost of the audit.

3

2061050.01

A.     Detection Of Delinquent Employers Subject To Audit

    1.     At least once every year, the Executive Directors of the IPF and IHF will send information to participants reflecting contributions received from participating employers. The participants will be encouraged to report missing hours to the CCU.

    2.     The CCU will take steps to insure that delinquencies of participating employers are recovered.

B.     Audits Performed By Third Parties

    1.     The CCU will rely upon audits performed by third parties when CCU determines that they conform to auditing procedures contained in the CCU's Guidelines.

    2.     The CCU periodically will monitor the audits of third parties in order to confirm their reliability.

C.     Audits Performed On Employers Contributing Directly To The CCU

    1.     The CCU will coordinate with third parties who perform audits on employers contributing directly to CCU and will insure that such audits conform to CCU guidelines.

    2.     As to employers contributing directly to the CCU who are not subject to audits by third parties, CCU will perform two types of payroll audits on directly contributing employers in order to insure compliance.

       a.     <u>Random Audits</u> -- Audits may be conducted on any participating employer at any time, on a random basis, at the direction of the Director.

       b.     <u>Problem Audits</u> -- When the Director receives information from a local union, covered member or other source indicating that an employer may be delinquent, the Director may order that an audit be conducted.

D.     Notification Of Audit Delinquency

    1.     The CCU Office will send a Notice of Delinquency to audited employers found to be delinquent stating the amount of additional contributions owing as a result of the audit.

    2.     Any unsatisfied audit deficiency will be treated according to the CCU's Collection Procedures following the intervention of counsel.

E.     Form of Audits

4

2061050.01

1.  All audits will be carried out under procedures formulated by the Director.

2.  All employer books and records set forth in the audit procedures will be made available to the CCU auditor.

IV.    BONDS

The Director may, in his sole discretion, require an employer to post a cash or surety bond in an amount and under terms necessary to protect the interests of the applicable CCU Entity.

5

**EXHIBIT B**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JOHN FLYNN, et. al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-0752 (RMU) |
| | ) | |
| WATERBURY MASONRY & FOUNDATION, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF IRA R. MITZNER IN SUPPORT OF
## PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT

Pursuant to 28 U.S.C. § 1746, I, **IRA R. MITZNER**, hereby declare as follows:

1.     I am partner with the law firm of Dickstein Shapiro LLP, counsel to the Plaintiffs John Flynn, James Boland, Gerald O'Malley, Ken Lambert, Gerard Scarano, H.J. Bramlett, Eugene George, Paul Songer, Charles Verlardo, Matthew Aquiline, Gregory R. Hess, Michael Schmerbeck, Vincent Delazzero, and Benjamin Capp ("IPF" or "Fund"), and Jim Allen, Matthew Aquiline, Lon Best, James Boland, Ted Champ, Raymond Chapman, Vincent Delazzero, Bruce Dexter, John Flynn, Eugene George, Gregory Hess, Fred Kinateder, Dan Kwiatkowski, Ken Lambert, Santo Lanzafame, Dick Lauber, William McConnell, Edward Navarro, Gerald O'Malley, John Phillips, Charles Raso, Mark Rose, Kevin Ryan, Gerard Scarano, Michael Schmerbeck, Paul Songer, Joseph Speranza and Fred Vautour ("IMI"), in the above-captioned case. I have personal knowledge of the facts stated herein and, if called to testify as a witness, I could and would competently testify as set forth below.

2.     On May 6, 2008, service of process was effected upon Defendant Waterbury & Masonry & Foundation, Inc. ("Waterbury Masonry"). A Declaration in Support of Service of Summons and Complaint was filed with the Court on June 9, 2008.

3.     As of this date, no answer to the Complaint has been filed by Defendant. On June 10, 2008, default was entered by the Clerk of the Court against Defendant.

4.     As set forth in the accompanying Declaration of David F. Stupar, Defendant owes the following sums to Plaintiffs:

| | | |
|---|---|---|
| $ | 12,443.35 | Contributions, interest, additional interest and audit fees for the audit period of January 2002 through June 2005 |
| $ | 3,356.61 | Contributions, interest, additional interest and audit fees for the audit period of January 2005 through December 2006 |
| $ | 350.00 | Filing fee (for U.S. District Court) |
| $ | 166.85 | Process Server's fee |
| $ | $16,316.81 | Amount Due the IPF and IMI by Defendant for unpaid contributions, interest, liquidated damages, court fees and service of process fees |

5.     Additionally, the Employee Retirement Income Security Act of 1974 ("ERISA") provides for the mandatory award of attorney's fees. ERISA Section 502(g)(2)(D), 29 U.S.C. § 1132(g)(2)(D). Plaintiffs' counsel has charged the Fund less than the firm's market rate in this matter for well-intentioned, public-spirited reasons. Counsel for Plaintiffs has offered this reduced fee in order to mitigate financial hardships to the Fund, which provides retirement benefits to members of the International Union of Bricklayers and Allied Craftworkers. We believe that our efforts help to ensure the viability of the Fund and, in turn, the welfare of those participants and beneficiaries who depend on their pensions for income after retirement. Counsel for the Funds, consistent with the decision of the United States Court of Appeals for the District

DSMDB-2469043

of Columbia Circuit in *Board of Trustees of the Hotel and Restaurant Employees Local 25 and Employers' Health and Welfare Fund v. JPR, Inc.*, 136 F.3d 794, 800-808 (D.C. Cir. 1998), on remand, 1999 WL 1567733 (D.D.C Sept. 10, 1999), and for the reasons set forth in paragraph 5 above, therefore seeks to recover counsel's market rates in this action rather than the reduced fee charged to the Fund.

6.     I am a partner with the firm of Dickstein Shapiro LLP and the counsel of record for the Plaintiffs, the IPF and IMI, in the above-captioned case.

7.     I have been in practice for thirty-five years and am the author of the book, *ERISA Litigation: A Basic Guide,* which contains a chapter on collection of employer delinquencies. I have spoken and written on the collection of employer delinquencies since ERISA was enacted in 1974. I have been inducted as a Fellow of the American College of Employee Benefits Counsel, an organization that is limited to lawyers with over 20 years of experience who demonstrate excellence in the quality of their practice and who seriously contribute to the public's understanding and appreciation of employee benefits. I have been counsel of record in some of the leading ERISA cases involving collection of employer delinquencies under ERISA in the District of Columbia, including *Flynn v. Dick Corp.*, 481 F.3d 824, 831 (D.C. Cir. 2007); *Flynn v. Ohio Building Restoration, Inc.,* 317 F. Supp. 2nd 22 (D D. C. 2004)*, appeal dismissed,* No. 04 CV 7091 (2005 U.S. App. LEXIS 12794 (D.C. Cir. June 27, 2005); *Flynn v. R.C. Tile,* 353 F.3d 953 (D.C. Cir. 2004); *Joyce v. Clyde Sandoz Masonry,* 871 F.2d 1119 (D.C. Cir.), *cert denied,* 493 U.S. 918 (1989); and *Joyce v. Silveri,* 66 F. Supp. 2d 1 (D.D.C. 1999). The hourly rate charged by the Firm for my services reflects my expertise and extensive experience in ERISA litigation.

8.     Charles V. Mehler III, an associate attorney who has worked with me on this case, graduated *cum lade* from Washington and Lee University School of Law in 1996. He then served as a judicial clerk for the Honorable Lydia Calvert Taylor, Chief Judge of the Circuit

3

DSMDB-2469043

Court in Norfolk, Virginia, and the Honorable Charles E. Poston, Judge of the Circuit Court in Norfolk, Virginia. Mr. Mehler joined Dickstein Shapiro as an associate in 2000. He has worked closely with Mr. Mitzner on ERISA litigation for the past eight years, and is co-author of "Who Is a Fiduciary? – Implications of Supreme Court Rulings," published in Employee Benefits Journal, Vol. 26, No. 3 (September 2001).

9.    Claudette Elmes, a paralegal who has worked on this case, has been employed as a paralegal with the firm of Dickstein Shapiro for more than twenty years and has assisted Mr. Mitzner in that capacity with collection litigation pursuant to ERISA for the past ten years. Ms. Elmes obtained a paralegal certificate in 1988 and a JD in 1995 from the George Washington University. The hourly rate charged by Dickstein Shapiro LLP for the services of Ms. Elmes is commensurate with her educational background and many years of experience in the paralegal field.

10.    Stephen Zachary, a paralegal who has worked on this case, was employed as a paralegal with the firm of Dickstein Shapiro from the summer of 2005 through July 2007. Mr. Zachary worked under the close supervision of Mr. Mitzner and Ms. Elmes. Mr. Zachary received a Bachelor's degree from Washington and Lee University in 2004. The hourly rate charged by the Firm for the services of Mr. Zachary was commensurate with his educational background, experience and supervision.

11.    Evan Oxhorn, a paralegal who has worked on this case, has been employed as a paralegal with the firm of Dickstein Shapiro since July 2007. Mr. Oxhorn works under the close supervision of Mr. Mitzner, Mr. Mehler, and Ms. Elmes. Mr. Oxhorn received a Bachelor's degree with Honors from Georgetown University in 2005. The hourly rate charged by Dickstein Shapiro LLP for the services of Mr. Oxhorn is commensurate with his educational background and supervision.

4

12.   The fees incurred in this action to date, calculated according to the normal billing rates for Dickstein Shapiro LLP in effect currently or at the time services were performed for IPF matters, are as follows:

| | | Hours | Per Hour | Total |
|---|---|---|---|---|
| Charles V. Mehler (Associate) | 2008 | .2 | $435.00 | $87.00 |
| Claudette Elmes (Paralegal) | 2008 | .9 | $240.00 | $216.00 |
| Stephen Zachary (Paralegal) | 2007 | .2 | $145.00 | $29.00 |
| Evan Oxhorn (Paralegal) | 2007 2008 | 6.9 7.0 | $115.00 $145.00 | $793.50 $1,015.00 |
| **Total** | | **15.20** | | **$2,140.50** |

13.   The default of Defendant for failure to answer was entered by the Clerk of this Court on June 10, 2008.

14.   The Plaintiffs therefore pray for entry of default in favor of Plaintiffs in the total amount of $18,457.31.

I declare under penalty of perjury that the foregoing is true and correct.

Date: August 29, 2008

Ira R. Mitzner

5

EXHIBIT C

Default - Rule 55A (CO 40 Revised-DC 02/00)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN FLYNN, et al

_____

Plaintiff(s)

Civil Action No.  08-752 RMU    _____

V.

WATERBURY MASONRY & FOUNDATION,
INC.

_____

Defendant(s)

RE:  WATERBURY MASONRY & FOUNDATION, INC.

## DEFAULT

It appearing that the above-named defendant(s) failed to plead or otherwise defend this action

though duly served  with summons and copy of the complaint    on         May 6, 2008          , and an

affidavit on behalf of the plaintiff having been filed, it is this 10th  day of _____June_____ , 2008 declared

that  defendant(s) is/are in default.

NANCY MAYER-WHITTINGTON, Clerk

By: _____ N. Wilkens _____

Deputy Clerk

**EXHIBIT D**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JOHN FLYNN, JAMES BOLAND, GERALD O'MALLEY, KEN LAMBERT, GERARD SCARANO, H. J. BRAMLETT, EUGENE GEORGE, ROBERT HOOVER, MATTHEW AQUILINE, GREGORY R. HESS, MICHAEL SCHMERBECK, VINCENT DELAZZERO, BENJAMIN CAPP, and WILLIAM MCCONNELL<br>as Trustees of, and on behalf of, the<br>**BRICKLAYERS & TROWEL TRADES INTERNATIONAL PENSION FUND**<br>620 F Street, N.W.<br>Washington, DC 20004<br>(202) 783-3788,<br><br>and,<br><br>JIM ALLEN, MATTHEW AQUILINE, LON BEST, JAMES BOLAND, TED CHAMP, RAYMOND CHAPMAN, VINCENT DELAZZERO, BRUCE DEXTER, JOHN FLYNN, EUGENE GEORGE, GREGORY HESS, FRED KINATEDER, DAN KWIATKOWSKI, KEN LAMBERT, SANTO LANZAFAME, DICK LAUBER, WILLIAM MCCONNELL, EDWARD NAVARRO, GERALD O'MALLEY, JOHN PHILLIPS, CHARLES RASO, MARK ROSE, KEVIN RYAN, GERARD SCARANO, MICHAEL SCHMERBECK, PAUL SONGER, JOSEPH SPERANZA, and FRED VAUTOUR<br>as Trustees of, and on behalf of, the<br>**INTERNATIONAL MASONRY INSTITUTE**<br>620 F Street, N.W.<br>Washington, DC 20004<br>(202) 783-3788,<br><br>Plaintiffs,<br><br>v.<br><br>WATERBURY MASONRY & FOUNDATION, INC.<br>120 Commerce Court<br>Cheshire, CT 06410<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>Civil Action No.<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

2358965

## COMPLAINT

Plaintiffs, by their attorneys, DICKSTEIN SHAPIRO LLP, complaining of the Defendant, allege as follows:

### CAUSE OF ACTION

#### Jurisdiction and Venue

1.     This is an action brought by the fiduciaries of the Bricklayers & Trowel Trades International Pension Fund ("IPF" or "Fund"), and the fiduciaries of the International Masonry Institute ("IMI") to enforce the terms of the Plan and Trust Agreements adopted by the IPF and IMI, and the provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). This action arises under the laws of the United States, specifically Section 502(a)(3), 502(g)(2), and 515 of ERISA, 29 U.S.C. §§ 1132(a)(3), 1132(g)(2), 1145. Pursuant to Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1), jurisdiction is therefore conferred on this Court.

2.     The IPF and IMI are administered in the District of Columbia. Venue for the claims asserted by the IPF and IMI is conferred on this Court pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), which provides:

> (2) Where an action under this subchapter is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found.

#### Parties

3.     Plaintiffs, John Flynn, James Boland, Gerald O'Malley, Ken Lambert, Gerard Scarano, H. J. Bramlett, Eugene George, Robert Hoover, William McConnell, Matthew Aquiline, Gregory R. Hess, Michael Schmerbeck, Vincent DeLazzero and Benjamin Capp, are Trustees of, and sue on behalf of, the IPF. The IPF is an "employee benefit plan" within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3), and is a "multiemployer plan" within

2

the meaning of Section 3(37) of ERISA, 29 U.S.C. § 1002(37). The IPF trustees bring this action on behalf of, and for the benefit of, the beneficiaries of the IPF in their respective capacities as fiduciaries.

4.     Plaintiffs, Jim Allen, Matthew Aquiline, Lon Best, James Boland, Ted Champ, Raymond Chapman, Vincent Delazzero, Bruce Dexter, John Flynn, Eugene George, Gregory Hess, Fred Kinateder, Dan Kwiatkowski, Ken Lambert, Santo Lanzafame, Dick Lauber, William McConnell, Edward Navarro, Gerald O'Malley, John Phllips, Charles Raso, Mark Rose, Kevin Ryan, Gerard Scarano, Michael Schmerbeck, Paul Songer, Joseph Speranza and Fred Vautour, are Trustees of, and sue on behalf of the IMI. The IMI is an "employee benefit plan" within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3), and is a "multiemployer plan" within the meaning of Section 3(37) of ERISA, 29 U.S.C. § 1002(37). The IMI trustees bring this action on behalf of, and for the benefit of, the beneficiaries of the IMI in their respective capacities as fiduciaries.

5.     Defendant, Waterbury Masonry & Foundation, Inc. ("Waterbury Masonry") is, and at all times hereinafter mentioned was, a company maintaining offices and conducting business in the state of Connecticut.

6.     Defendant employs or has employed members of the International Union of Bricklayers and Allied Craftsmen and its affiliated local unions ("Union").

### Violation Charged

7.     Waterbury Masonry acting through its authorized agents or officers, executed a collective bargaining agreement with the Union. This collective bargaining agreement is annexed hereto as Exhibit A and is hereinafter referred to as the "Agreement."

3

8.     Pursuant to the Agreement, Defendant agreed to make certain payments to the IPF and IMI on behalf of covered employees of Defendant.

9.     Having submitted some contributions, Defendant has demonstrated an awareness of the obligation to make those payments.

10.    An examination of Defendant's books and records ("audit") performed by the independent accounting firm of Buckley, Frame, Boudreau & Co., P.C. covering the time period January 2002 through June 2005 revealed that Defendant failed to properly submit required reports and contribution payments for work performed during this time period.

11.    As determined by this audit of Waterbury Masonry, the total due the IPF and IMI for covered work performed by Waterbury Masonry and/or its subcontractors during the period of January 2002 through June 2005 is $12,443.35 which represents contributions, interest calculated at 15 percent per annum, an additional computation of interest at 15 percent per annum calculated from the Due Date, and audit fees.

12.    An examination of Defendant's books and records ("audit") performed by the independent accounting firm of Buckley, Frame, Boudreau & Co., P.C. covering the time period January 2005 through December 2006 revealed that Defendant failed to properly submit required reports and contribution payments for work performed during this time period.

13.    As determined by this audit of Waterbury Masonry, the total due the IPF and IMI for covered work performed by Waterbury Masonry and/or its subcontractors during the period of January 2005 through December 2006 is $3,356.61, which represents contributions, interest calculated at 15 percent per annum, an additional computation of interest at 15 percent per annum calculated from the Due Date, and audit fees.

2358965

14.    Waterbury Masonry submitted reports to the IPF for work performed pursuant to the Agreement during the months of January 2002 through November 2003, but failed to submit related fringe benefit contributions.  Accordingly, the IPF determined the amounts due for this time period by conducting a Recap based on the reports submitted by Waterbury Masonry.

15.    The total of contributions due the IPF and IMI by Waterbury Masonry for work performed during the months of January 2002 through November 2003, as determined by the IPF Recap, amounts to $19,876.51.  Under the terms of the Plan and Trust Agreements adopted by the IPF and IMI, interest in the amount of $13,806.71, calculated from the Due Date at the rate of 15 percent per annum, and an additional computation of interest in the amount of $13,806.71 calculated from the Due Date at the rate of 15 percent per annum have been assessed on such delinquent contributions determined due by the Recap.

16.    Plaintiffs have brought this action in faithful performance of the fiduciary duties imposed upon them under Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1).  Plaintiffs have been, and are, incurring additional attorney's fees as a direct result of Defendant's failure to pay contributions in accordance with the terms and conditions of the Agreements.

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

1.  For the total amount of $63,994.60, which is constituted as follows:

a.  For unpaid contributions in the amount of $6,926.25 payable to the IPF and IMI for the audit covering the time period January 2002 through June 2005 plus any and all additional amounts found to be due and owing through the date of judgment (ERISA Section 502(g)(2)(A); General Collection Procedures of the Central Collections Unit of the Bricklayers and Allied Craftworkers ("Collection Procedures"));

5

2358965

b. For interest in the amount of $1,623.41 assessed on such unpaid contributions, calculated at 15 percent per annum from the Due Date (ERISA Section 502(g)(2)(B); Collection Procedures);

c. For additional interest in the amount of $1,623.41, assessed on such unpaid contributions, calculated at the rate of 15 percent per annum from the Due Date (ERISA Section 502(g)(2)(C)(i); Collection Procedures);

d. For the costs of conducting the audit in the amount of $2,624.99 (ERISA Section 502(g)(2)(D));

e. For unpaid contributions in the amount of $1,797.81 payable to the IPF and IMI for the audit covering the time period January 2005 through December 2006 plus any and all additional amounts found to be due and owing through the date of judgment (ERISA Section 502(g)(2)(A); General Collection Procedures of the Central Collections Unit of the Bricklayers and Allied Craftworkers ("Collection Procedures"));

f. For interest in the amount of $475.90 assessed on such unpaid contributions, calculated at 15 percent per annum from the Due Date (ERISA Section 502(g)(2)(B); Collection Procedures);

g. For additional interest in the amount of $475.90, assessed on such unpaid contributions, calculated at the rate of 15 percent per annum from the Due Date (ERISA Section 502(g)(2)(C)(i); Collection Procedures);

h. For the costs of conducting the audit in the amount of $607.00 (ERISA Section 502(g)(2)(D));

i. For unpaid contributions in the amount of $19,876.51 payable to the IPF and IMI from the Recap covering the time period January 2002 through November 2003 plus any and all additional amounts found to be due and owing through the date of judgment (ERISA

6

Section 502(g)(2)(A); General Collection Procedures of the Central Collections Unit of the Bricklayers and Allied Craftworkers ("Collection Procedures"));

      j. For interest in the amount of $13,806.71 assessed on such unpaid contributions, calculated at 15 percent per annum from the Due Date (ERISA Section 502(g)(2)(B); Collection Procedures);

      k. For additional interest in the amount of $13,806.71, assessed on such unpaid contributions, calculated at the rate of 15 percent per annum from the Due Date (ERISA Section 502(g)(2)(C)(i); Collection Procedures);

      l. For the costs of filing this action in the amount of $350.00 (ERISA Section 502(g)(2)(D));

      2. In the amount of Five Thousand Dollars ($5,000.00), and such additional amounts as may be incurred, representing attorney's fees and costs of this action (ERISA Section 502(g)(2)(D)).

      3. That Defendant be directed to comply with its obligations to submit all required reports and to make all contribution payments due and owing to the IPF and IMI, and to pay the costs and disbursements of this action.

2358965

4.  Such other relief as this Court deems appropriate, including judgment for any contributions, and interest thereon that may accrue subsequent to the filing of this complaint, as well as any resulting statutory damages thereon under ERISA.

Dated:  April _____30_____, 2008

By: _____
Ira R. Mitzner, DC Bar No. 184564
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC  20006
(202) 420-2200

Attorney for Plaintiffs

8

**EXHIBIT A**

CT 9696

AGREEMENT

RECEIVED JUL 29 1996

between

LABOR RELATIONS DIVISION,

THE ASSOCIATED GENERAL CONTRACTORS OF CONNECTICUT, INC.

a division of

CONNECTICUT CONSTRUCTION INDUSTRIES ASSOCIATION, INC.

and

MASON CONTRACTORS ASSOCIATION OF CONNECTICUT

and

DISTRICT COUNCIL OF CONNECTICUT

of the

INTERNATIONAL UNION OF BRICKLAYERS & ALLIED CRAFTWORKERS, AFL-CIO

BUILDING

April 1, 1996 through March 31, 1999

CT9696

# BUILDING TABLE OF CONTENTS

| Article | | PAGE |
|---|---|---|
| I | OBJECT ............................................ | 1 |
| II | TERRITORIAL JURISDICTION ....................... | 1 |
| III | EQUAL EMPLOYMENT OPPORTUNITY ............... | 2 |
| IV | UNION MEMBERSHIP ............................. | 3 |
| V | WAGES, HOURS, WORKING CONDITIONS AND HOLIDAYS | 3 |
| VI | HEALTH AND SAFETY STANDARDS ................. | 7 |
| VII | DIRECTOR AND FIELD REPRESENTATIVES ........... | 9 |
| VIII | FOREMAN ...................................... | 9 |
| IX | STEWARDS ..................................... | 9 |
| X | JURISDICTIONAL CLAIMS ........................ | 11 |
| XI | WORK RULES .................................. | 16 |
| XII | INTERNATIONAL MASONRY INSTITUTE TRUST AND IMI APPRENTICESHIP TRUST ..................... | 18 |
| XIII | INSURANCE ................................... | 20 |
| XIV | STATE AND FEDERAL LAWS ..................... | 20 |
| XV | WORK STOPPAGES ............................ | 20 |
| XVI | GRIEVANCE AND ARBITRATION PROCEDURE ........ | 20 |
| XVII | FRINGE BENEFIT FUNDS ........................ | 22 |
| XVIII | DUES CHECK-OFF ............................. | 26 |
| XIX | BUILDING & CONSTRUCTION ADVANCEMENT PROGRAM | 27 |
| XX | MANAGEMENT PREROGATIVES ................... | 28 |
| XXI | SEVERABILITY ................................ | 28 |
| XXII | TERM OF AGREEMENT .......................... | 29 |
| | AGC BRICKLAYER EMPLOYERS ................... | 32 |
| | MASON CONTRACTORS ASSOCIATION OF CT EMPLOYERS | 33 |
| | INDEX ....................................... | 34 |
| | LETTER AGREEMENT ........................... | 1A |

ii

## Agreement

This Agreement is made and entered into on this 16th day of April, 1996 by and among the LABOR RELATIONS DIVISION, THE ASSOCIATED GENERAL CONTRACTORS OF CONNECTICUT, INC., a division of CONNECTICUT CONSTRUCTION INDUSTRIES ASSOCIATION, INC. and the MASON CONTRACTORS ASSOCIATION OF CONNECTICUT, their successors or assigns, hereinafter referred to as the "Association", acting for and in behalf of those firms it is authorized and agrees to represent, each hereinafter referred to as the "Employer", and the DISTRICT COUNCIL OF CONNECTICUT OF THE INTERNATIONAL UNION OF BRICKLAYERS & ALLIED CRAFTSMEN, AFL-CIO, hereinafter referred to as the "Union".

### ARTICLE I

### OBJECT

In order to insure the public against conditions of the past, to prevent strikes or lockouts and to insures a peaceable adjustment and settlement of any and all disputes and differences that may arise between any of the parties to this Agreement without stoppage of work, and to bring about as near as possible at this time uniform conditions that will tend to stabilize and encourage construction, alteration and repair of buildings, both parties have entered this Agreement.

In order to carry out the bilateral spirit of this Agreement, in the event the Union grants more favorable terms to others or any signatory party to this Agreement, the Union will extend these more favorable terms to all the parties to this Agreement.

The Employer agrees not to sublet, assign or transfer any work covered by this Agreement to be performed at the site of a construction project to any person, firm or corporation, except where the subcontractor subscribes and agrees in writing to be bound by the full terms of this Agreement. All charges of violation of this paragraph shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement covering the procedures for the handling of disputes and the final and binding arbitration of disputes.

### ARTICLE II

### TERRITORIAL JURISDICTION

This Agreement shall apply to all work performed in covered employment within the state of Connecticut.

The following are the geographical jurisdictions of each Local Union.

1

CT9696

## ZONE - A

Hartford Local No. 1 -

Andover, Avon, Bloomfield, Bolton, Burlington, Columbia, Coventry, East Granby, East Hartford, East Windsor, Ellington, Enfield, Farmington, Glastonbury, Granby, Hartland, Hartford, Hebron, Manchester, Mansfield, Marlborough, Rocky Hill, Simsbury, Somers, South Windsor, Stafford, Suffield, Tolland, Union, Vernon, West Hartford, Wethersfield, Willington, Windsor Locks, New Britain, Newington, Berlin, Southington, Torrington, New Hartford, Canton, Norfolk, Barkhamsted, Colebrook, Winchester, Canaan, North Canaan, Salisbury, Sharon, Cornwall, Goshen, Warren, Washington, Morris, Litchfield, Harwinton, Bethlehem.

Bridgeport Local No. 2

Bridgeport, Easton, Fairfield, Milford, Monroe, Stratford, Trumbull, Ansonia, Derby, Shelton, Oxford, Seymour, and Southbury.

New Haven Local No. 6

New Haven, West Haven, North Haven, East Haven, Orange, Woodbridge, Bethany, Hamden, Branford, North Branford, Guilford, Madison, Wallingford, Meriden, and Cheshire.

New London Local No. 12

Middletown, Middlefield, Cromwell, Portland, East Hampton, Haddam, Killingworth, Lyme, Durham, Chester, Deep River, Essex, Clinton, Westbrook, Old Saybrook, Colchester, Lebanon, Windham, Hampton, Brooklyn, Killingly, Putnam,

Thompson, Woodstock, Eastford, Ashford, Pomfret, Chaplin, New London, Groton, Stonington, North Ston-ington, Waterford, East Lyme, Old Lyme, Norwich, Ledyard, East Haddam, Lisbon, Preston, Griswold, Voluntown, Sterling, Plainfield, Canterbury, Scotland, Sprague, Franklin, Bozrah, Montville and Salem.

Waterbury Local No. 16

Waterbury, Prospect, Naugatuck, Beacon Falls, Middlebury, Woodbury, Watertown, Thomaston, Wolcott, Bristol, Plymouth, Plainville, Terryville, Bethel, Bridgewater, Brookfield, Danbury, Kent, New Fairfield, New Milford, Newtown, Redding, Roxbury, Sherman, that portion of Southbury north of an east/west line directly above the city limits of Oxford.

## ZONE - B

Norwalk Local No. 4

Norwalk, Westport, Weston, Wilton, Ridgefield, New Canaan, Stamford, Darien and Greenwich.

## ARTICLE III
## EQUAL EMPLOYMENT OPPORTUNITY

There shall be no discrimination in the referral, hiring, placement, classification, upgrading, layoff or termination of employment of any individual by reason of age, race, creed, color, sex, national origin, occupationally irrelevant physical handicaps, or membership or nonmembership in the Union. The Union agrees to support and actively participate in affirmative action programs to promote equal employment opportunity in the construction industry.

2

## ARTICLE IV
## UNION MEMBERSHIP

**Section 1.** All employees who are members of the Union at the time of the signing of this Agreement shall continue membership in the Union. All other employees must become members of the Union on or after the eighth (8) day following the beginning of employment or the date of this Agreement, whichever is later, and must maintain their membership in the Union as a condition of employment to the extent of tendering the periodic dues and the initiation fees uniformly required by the Union as a condition of acquiring or maintaining membership therein.

**Section 2.** On all work covered by this Agreement, the first man on the job shall be furnished by the Employer. Thereafter, the District Council of Connecticut shall be given the first opportunity to refer applicants for employment with whichever BAC Local (1, 2, 4, 6, 12 and 16) having jurisdiction over the work to be given the first opportunity to refer applicants for employment for up to 50% of the jobs available during the entire course of the work, provided however, that contractors whose main place of business is located outside the state of Connecticut must maintain a ratio of three Connecticut BAC Members to one BAC member from outside the state of Connecticut throughout the duration of the project. The Employer reserves the right to select the applicant to be hired and there shall be no discrimination in referrals or hiring by reason of membership or non-membership in the Union. The second opportunity for Employment, when the Local is unable to furnish qualified mechanics, provides the employer the opportunity to hire from any source available. In case of a lay-off, employees shall be laid off in inverse order of job opportunity.

## ARTICLE V
## WAGES, HOURS, WORKING CONDITIONS, AND HOLIDAYS

**Section 1.** Employees covered under this Agreement shall receive the following regular straight time hourly rate of pay for all time worked during the regular work day on and after the effective dates indicated:

|  | Effective Date | Hourly Rate |
|---|---|---|
| Zone A | 4/1/96-3/31/97 | $21.90 |
|  | 4/1/97-3/31/98 | $22.30 |
|  | 4/1/98-3/31/99 | $22.75 |
| Zone B | 4/1/96-3/31/97 | $22.30 |
|  | 4/1/97-3/31/98 | $22.70 |
|  | 4/1/98-3/31/99 | $22.95 |

**Section 2.** The Union shall have the option to divert monies from wages to any of the fringe benefits funds to which contributions are required by this Agreement, upon thirty (30) days' prior written notice to the Associations signatory hereto. Monies can be diverted back to wages from the Pension, Health and Welfare and Annuity funds or reallocated among these funds, subject to the approval of the Trustees of any affected fund and the agreement in writing of the parties to this Agreement. If there is a required increase in the hourly rate of contributions to the Health Fund during the term of the Agreement, the increase shall be taken out of the wage rate or the carried over wage rate and the Association shall be given 60 days' prior notice in writing.

3

CT9696

**Section 3**. There shall be only one (1) hourly rate of wages paid to journeymen bricklayers and masons on the same job. Bricklayers or masons, other than foremen covered under this Agreement, shall not be required to check units or measure or count any amount of work performed during the day or any day of the work week.

**Section 4**. The regular work week shall consist of five eight (8) hour days, Mondays through Fridays, for a total of forty (40) hours. There shall be a one-half (1/2) hour unpaid lunch period between 12:00 noon and 12:30 p.m. If unusual circumstances warrant, as shall be determined by the Employer, the one-half (1/2) hour lunch period shall be allowed anytime between the hours of 11:30 a.m. and 1:30 p.m.

**Section 5**. The regular starting time shall be 8:00 a.m. or such other time as established by the Employer between 7 a.m. and 9 a.m. Any employee who is transferred to another job because of weather shall not displace any employee working on that job to which he is transferred.

When a job is unable to start before 10 a.m., no work is to be performed that day, unless the foreman shall specify a definite starting time. Employees ordered to stay on the job shall be paid from 10 a.m. This provision is based on a 8:00 a.m. to 4:30 p.m. workday. In the event the working hours become 7:00 to 3:30 p.m., substitute "9:00 a.m." for "10:00 a.m." in the preceding two sentences.

**Section 6**. Overtime - Employees shall be paid the overtime rate of one and one half times the regular straight time hourly rate of pay for all time worked in excess of eight hours per day and forty hours per week. Employees shall be paid the overtime rate of

two times the regular straight time hourly rate of pay for all time worked on Sundays and holidays. There shall be no pyramiding of overtime.

**Section 7**. On projects subject to limitations or restrictions by government agencies, railroads, utilities and private owners as to when work may be performed, the Employer may schedule work in accordance with these limitations or restrictions and all work will be paid for solely at the regular straight time rate of pay, regardless of the time of the day or the day of the week that the work is performed, except that time and one-half the regular rate of pay will be paid for all hours of work over forty (40) in a week.

**Section 8. Saturday Make-Up Day**. On any given project, Saturday may be worked at the straight time rate of pay if work is not performed on a day during that week because of a holiday or inclement weather, provided that an employee may not be discriminated against for not working on such a Saturday and that work on Saturday is scheduled for 8 hours.

**Section 9**. The Employer shall establish one day each week, Monday through Thursday, as the regular pay day for its employees. If a regular pay day falls on a holiday, recognized in Section 5 hereof, employees shall be paid before quitting time on the regular work day immediately preceding the holiday, where practical.

The Employer shall pay employees by cash or check, and shall accompany each payment with an itemized written statement setting forth the payroll period, the gross pay for said period, the hours worked, and an itemized list of deductions from the employee's gross pay. Failure of the

4

Employer's bank to honor payroll checks because of insufficient funds may cause the Union to require the Employer to pay in cash on each regular pay day.

Section 10. Holidays - Recognized holidays, without pay, shall be New Year's Day, Good Friday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day. Under no circumstances shall work be scheduled for Labor Day, except in cases of extreme emergency involving life or property. In the event any of the above holidays fall on a Sunday, it will be observed on the following Monday.

Section 11. Any employee requested to report for work by an Employer, or his representative, who is not put to work after bringing his tools on the job, shall receive two (2) hours' pay provided the employee is not prevented from working by conditions caused by adverse weather or other conditions beyond the control of the Employer, in which event the employee shall be signed in and put to work on the next day when there is work available, weather permitting.

Any employee or employees who commence working and are held up because of weather conditions during the first hour of work shall receive nothing less than one (1) hour of pay unless they voluntarily leave the job. If any employee is held up after the first hour of work has been completed, such employee shall receive his pay to the nearest hour following the cessation of work.

Section 12. Any employee or employees who have worked for at least two hours and subsequently laid off for lack of work during the regular working hours shall be paid for 8 hours, but shall not receive pay for that

day beyond the hours already worked if the job is stopped by the architect or for unsafe conditions.

Section 13. Employees shall be paid for lost time due to the erection or stocking of scaffolds or waiting for materials that are already on the job, except in the event of a breakdown in equipment or other conditions beyond the control of the Employer.

Section 14. Employees shall receive regular pay when being transferred from one job to another during regular working hours.

Section 15. There shall be only one scale of journeymen wages per Employer on one job and the highest scale shall prevail. When the Employer violates this agreement concerning the scale of wages by paying a higher rate of pay, he shall be obliged to pay the higher rate of pay to all bricklayers and masons employed on the job. The higher wage rate shall continue in effect until the completion of the job and in no event shall a rate of wage so established be reduced on that job.

Section 16. No Employee shall stand in line on a job when a check or time clock system is used before and after working hours.

Section 17. Should the Employer willfully work his employees beyond the established quitting time, the employees working on the job shall be paid to the next nearest one-half hour at the overtime rate.

Section 18. Wages shall be paid any time between 8:30 a.m. and the established quitting time on the job. No more than three (3) days pay shall be kept back on pay by any Employer after the close of its payroll week. In case of inclement weather on pay

5

CT9696

day, the pay shall be on the job by 10:30 a.m.. where practical.

Section 19. Any employee not receiving his money on the specified pay day shall receive waiting time at the regular rate of wages until paid. All employees entitled to receive waiting time and requesting it and not receiving it, shall report to a Field Representative of the District Council for settlement. No more than two (2) days' waiting time will be demanded or required on any job, unless the job is placed in the hands of a bonding company or receiver, for completion.

Section 20. No employee shall be laid off before the established starting time unless he was absent at the end of the preceding normal work day when work was available.

Section 21. The Employer shall see that a suitable shed or locker is available for the use of employees covered by this Agreement.

Section 22. In case of layoff of an employee, the employee will be paid whatever wages are due him. In the case of a layoff, the employee will be notified at least one-half hour before quitting time, during which time the employee shall pick up his tools and be paid whatever wages are due him. The Employer shall give the employee an unemployment compensation slip at the time of layoff or discharge.

Section 23. Any employee who willfully quits work or who is discharged for intoxication or other cause shall not be entitled to any of the layoff or discharge pay benefits provided for in this Article V.

Section 24. There shall be no lost time on the day of injury for any employee injured on the job and obliged to receive immediate medical attention or treatment.

Section 25. All employees who work on jobs where they are exposed to extreme man-made temperatures, uncleanliness, dust, mastics or in the laying of fire brick or acid brick or any other material that may be injurious to the health, shall be given ten (10) minutes to wash up before 12 noon and fifteen (15) minutes to wash and adjust proper clothing before quitting time. No employees shall leave the premises before the established quitting time.

Section 26. Shift Provision - Shift work may be permitted under the following conditions:

(a) Where a job has more than one (1) eight (8) hour shift in any one ( 1) twenty-four (24) hour period, bricklayers will not be permitted to work more than one (1) shift in any one (1) work day.

(b) All employees on shift work shall receive a full normal work day's pay.

(c) Seven and one-half (7-1/2) hours work shall constitute the shift period during the second shift and seven (7) hours work during the third shift. There shall be a one-half (1/2) hour lunch period at the midpoint of the second and of the third shift.

(d) Where no third shift exists, time worked beyond the end of the second shift shall be paid for at the overtime rate.

(e) No shift work will be permitted for less than three (3) consecutive regular work days.

6

(f) Shift conditions and wages shall apply to alteration work in occupied areas without the requirement that work be performed during the regular work day, provided a written shift permit is issued by the Union.

(g) When an Employer wishes to work bricklayers for the second or third shift periods, he shall notify the Union in writing within twenty-four (24) hours prior to the shift so that proper arrangements shall be made.

Section 27. Carry Over Provision. With respect to jobs for which bids were due to be submitted by the Employer on or before March 31, 1996, the wage rates set forth in the 1993-1996 Agreement are to remain and continue in effect for those jobs. Any increase in Fringe Benefit Fund contributions under this 1996-1999 Agreement shall be payable on the effective date of said increase.

On any new jobs bid on and after April 1, 1996, the minimum hourly wage rates that are set forth in this agreement, that are in effect at the time when bids are due on a specific job, shall remain and continue in effect throughout the duration of the job, notwithstanding the provisions contained in this Agreement relative to the termination date of the Agreement, or any other term or provision of this Agreement, or any provision contained in any successor Agreement. It is understood, however, that the job must start within six (6) months of the date of the bid or this section will not apply, that increases in Fringe Benefit Fund contributions set forth in this agreement shall be payable on the effective date of said increase, and that this provision does not extend a wage rate for more than one (1)

year beyond the expiration date of the rate in effect at the time of the bid.)

Section 28. In order to maintain an accurate wage rate, each Employer agrees to supply the Union, upon request, with all the necessary pertinent information required for the completion of the United States Department of Labor Form WD10.

Section 29. When work on any job stops for any reason and then is resumed, employees who are laid off for forty-five (45) days or less on this account shall be given preference to return to work on that job.

## ARTICLE VI
## HEALTH AND SAFETY STANDARDS

Section 1. Any employee who willfully violates any safety regulation of the Employer or of a governmental agency shall be subject to discharge without recourse.

Section 2. Employees shall abide by all safety regulations promulgated by the Employer. Employees shall report to the Employer every injury incurred in the course of employment on the day such injury occurs, on a form provided by the Employer, if it is physically possible for the employee to do so.

Section 3. Any masonry unit of concrete, cinder or like materials weighing 40 pounds or more shall be set by two masons.

Section 4. All walls built of the above designated weight shall only be raised seven (7) courses.

7

CT9696

**Section 5.** All employees covered by this Agreement shall be fully protected from overhead work.

**Section 6.** Excessive dust, carborundum or other wheel or so-called saws for the use of cutting any brick, or block, shall have a blower or wet wheel to remove from the atmosphere any dust created by such process or the employee shall be provided with an OSHA approved mask. The Employer shall furnish all necessary tools for this operation, also glasses, nose protection, gloves, considered necessary for the health of the Operator.

**Section 7.** When using machines in the performance of work, the machine shall be properly guarded to prevent possible injury, all safety devices to be supplied by the contractor and no safety devices to be removed from such machines.

**Section 8.** No employee shall be required to work where he is subject to excessive dust or grit caused by masonry cutters or grinders. This does not pertain to the operator who shall be adequately protected.

**Section 9.** The Employer shall provide a place to operate the masonry saw which is protected from weather conditions (including providing heat when necessary) wherever possible and shall provide the BAC member operator with necessary safety equipment.

**Section 10.** Foot scaffolds shall not be permitted with the exception of topping of finished walls.

**Section 11.** Scaffolding used for washing down shall be no less than three (3) ten inch planks in width.

**Section 12.** Any safety or protective clothing and/or equipment furnished to employees by the Employer shall remain the property of the employer and shall be returned in good condition to the Employer when no longer in use on the project. Each employee, if required by the Employer, shall sign a receipt for said clothing and/or equipment at the time he receives it, and he shall be held responsible for the cost of replacement of any such clothing and/or equipment which is not returned in reasonably good condition, considering normal wear and tear, to the Employer.

**Section 13.** Drug Testing. In an effort to enhance the safety of the workplace, testing of employees and applicants for drug, alcohol or other substance impairment may be required by the owner or employer. The testing program shall be performed by recognized physicians and/or laboratories and shall comply with any and all federal state and local standards. The cost of such program shall be borne by the Employer. When testing is required by the Employer Employees shall be paid for the time necessary to take the test provided that the results of the employee's test are negative. No time shall be paid to an employee whose test results are positive.

Nothing herein shall be construed to impose any obligation, duty or responsibility upon the Union or its duly authorized representatives to test employees for drugs, alcohol or illegal substances.

The Employer shall indemnify and hold harmless the Union, its officers, agents, employees and representatives from and against any and all loss, suits, actions or claims of any character by any employee or group of employees covered under this

8

Agreement arising from the drug, alcohol or substance impairment testing practices set forth in this Article, except that the Employer shall not be held responsible in any manner for loss, suits, actions or claims of any character in the event the Union knowingly refers employees to the Employer, who are under the influence of drugs, alcohol or other illegal substances.

"Knowingly" as used herein shall not mean inferred knowledge, but shall rather mean that the referring agent or representative of the union actually knew that the employee in question was under the influence of drugs, alcohol or other illegal substances at the time of the subject referral.

## ARTICLE VII
## DIRECTOR AND FIELD REPRESENTATIVES

Section 1. All contractors starting work covered by this Agreement shall notify the District Council Director, five (5) working days before the work is to commence.

Section 2. The Director and/or Field Representatives may visit any building under construction. If the Director and/or Field Representatives are barred from any job by the Employer while in the performance or their duties, the Union shall have the right not to permit its members to work on the job.

If there is a location designated by the general contractor or construction manager for visitors to sign in on the project, the Director and/or Field Representatives must sign in prior to entering any work area.

Section 3. The Director or Field Representative may inspect any working member's pay stub or envelope during the job.

## ARTICLE VIII
## FOREMEN

Section 1. When four (4) or more bricklayers or masons are hired on a job, one (1) shall be designated as the foreman.

Section 2. The foreman shall be paid a minimum of $1.00 per hour above the journeymen's rate and shall be guaranteed forty (40) hours of work or pay per week.

Section 3. Foreman have the authority to hire, discharge and exercise supervisory functions and are recognized as the representatives of management. Foremen shall be practical mechanics in the branch of the trade over which they exercise supervision and members of the International Union of Bricklayers and Allied Craftworkers.

Section 4. Foremen shall be allowed to work with the tools of the trade.

## ARTICLE IX
## STEWARDS

Section 1. The first member to start to work on any job shall act as shop steward until he or another member is duly appointed by the Union from among the Employer's employees working on the particular job or a steward is furnished by the Director or the Field Representative. There shall be no non-working stewards.

9

CT9696

**Section 2.** Any employee appointed by the Union to serve as steward must be able to speak and read the English language and he must be competent to perform the work available in the branch of the trade to which he is assigned. His authority, however, is recognized as subordinate to that of the Field Representative.

**Section 3.** The steward shall be allowed a reasonable amount of time during normal working hours without loss of pay to perform the following duties of steward:

(a) the steward shall be permitted to call the Field Representative to report complaints;

(b) examine the dues books of employees on the job;

(c) see that the Employer supplies a suitable tool house heated in cold weather from October 1 to April 1, where employees may eat meals in comfort. It shall be separate from any material shed and shall be provided with a lock, with a key in the steward's possession;

(d) Either the foreman or the steward may open the aforesaid shed before starting and stopping of work;

(e) see that the Employer supplies all lines and furnishes drinking water in a covered vessel with individual drinking cups.

(f) see that proper toilet facilities are provided.

(g) when determined by the Employer to be required, the steward may accompany any injured or sick bricklayer, or mason and the steward shall be paid for any lost time in so doing on the day of the injury.

(h) check all scaffolds before being used by employees covered by this Agreement.

**Section 4.** The Employer shall be responsible for the loss of masonry tools after working hours as a result of fire or breaking and entering of the tool shanty, up to One Hundred Fifty Dollars ($150. 00) per man, providing the employee, before starting work on the project furnishes the Employer a written inventory of his tools and the replacement cost thereof, which is verified by a representative of the Employer.

**Section 5.** (a) The Steward shall remain at work so long as any employee in the branch of the trade in which the steward is working remains at work or until the completion of work, provided he is qualified to perform the available work.

(b) No steward shall be transferred to another job without prior notice to the Field Representative.

(c) When workers are all laid off before the job is completed, for reasons beyond the contractor's control, the steward shall have the first preference of being called back when the job starts up again. Punch list not included.

**Section 6.** If any work must be performed by a single employee after the regular working hours, the shop steward is not to replace that employee if such employee had the assignment during regular working hours.

**Section 7.** There shall be no interference with the Steward in his reasonable performance of the duties set forth herein. The Steward shall not be discharged or discriminated against for his proper performance of the duties set forth herein.

10

**Section 8.** Should an Employer determine to layoff or discharge a shop steward, it shall so notify the Director of the District Council who shall immediately investigate the matter and notify the Employer of his decision at that time. If the parties are unable to reach agreement. the justifiability of the Employer's action shall be submitted within forty-eight hours to arbitration.

## ARTICLE X
## JURISDICTIONAL CLAIMS

**Section 1.** The Employer acknowledges that the Union claims items of work listed in the International Constitution and Rules of Order, Code 1 Branches of the Trade, as amended in 1992, and as set forth below, to be within its work jurisdiction. In making work assignments. the Employer shall consider area and trade practice, work ordinarily and customarily performed by employees covered by this Agreement and work Jurisdiction agreements between international unions.

**A.** **Brick Masonry** - Bricklaying masonry shall consist of the laying of bricks made from any material in. under or upon any structure or form of work where bricks are used. whether in the ground, or overrates surface, or beneath water; in commercial buildings. rolling mills, ironworks, blast or smelter furnaces, lime or brick kilns; in mines or fortifications, and in all underground work, such as sewers, telegraph electric and telephone conduits. All cutting of joints, pointing, cleaning and cutting of brick walls, fireproofing, block-arching, terra-cotta cutting and setting, the laying and cutting of all tile, plaster, mineral wool, cork blocks and glass masonry, or any substitute for above material. the laying of all pipe

sewers or water mains and the filling of all joints on the same when such sewers or conduits are of any vitreous material, burnt clay or cement, or any substitute material used for the above purpose, the cutting, rubbing, and grinding off of all kinds of brick and the setting of all cut stone trimmings on brick buildings. is bricklayers' work.

Cleaning, grouting, pointing and other work necessary to achieve and complete the work under the foregoing category shall be the work of the bricklayer.

All terra cotta called unit tile in sizes over 6" x 12" regardless of method of installation and all quarry tile over 9" x 9" x 1 1/4" size, split brick or quarry tile or similar material if bedded and jointed with one operation and the bedding, jointing and pointing of the above material shall be the work of the craft installing same.

All burnt clay extruded cellular products regardless of trade name or method of installation when used as a veneer on structures.

All clay products known as terra cotta tile. unit tile, ceramic veneer and machine made terra cotta and like materials in sizes larger than 6" x 12", regardless of the method of installation.

Where the preponderance of material to be installed is of the above sizes, and when material of lesser size is to be used in connection therewith, the bricklayers shall install such materials. Brick paving comes under bricklayers' trade classification. In addition, such other construction work in this area that has been done, as the custom and practice by members of this Union.

11

CT 4696

The setting, grouting, and dry packing of all plates and machinery. The installation of all types of wall ties and anchors that support masonry walls.

Built-in corner guards, bearing plates and loose lintels.

The installation, assembly and erection of all masonry panels, whether brick, tile, natural stone, cement, utilizing a light frame, steel stud back-up system.

The cleaning, rubbing down, grinding, patching of masonry block walls.

The installation, pointing, cleaning and finishing of R-Brick, Pan-Brick or other thin brick systems.

The fabrication and installation of brick panels or other prefabricated masonry panels, including the rigging, hooking on, signalling, bolting and/or welding, the installation of all anchors and supports and other miscellaneous hardware.

The laying, setting, bedding, pointing, grouting, steam cleaning, washing, spreading of asphalt and the sweeping of joints with sand, cement or stone dust of all paving units made of brick, stone, cement, precast or concrete, whether such units are interlocking, laid dry or in dry pack in mortar, sand, stonedust, asphalt, mastic, or substitutes.

The installation of Nailon brick or similar burnt clay units, including the cutting, fitting, nailing on, pointing, caulking and cleaning.

The application of all sand and cement coats, other substitute cement based materials, fireproofing materials, whether troweled or rolled on all masonry, cement, precast or concrete.

The water blasting machine or similar type of cleaning machines shall be the tool of the trade and operated by the members of the International Union of Bricklayers and Allied Craftsmen.

All exterior and interior cleaning of buildings, whether brick, stone, precast, cement or concrete, regardless of whether water, detergent, acid, restorer, or other substitute cleaning products are used.

The waterblasting, or other cleaning procedure used to expose aggregate or to prepare masonry to receive a new finish.

Waterblasting or other cleaning procedure which will be performed in connection with the pointing or caulking of a building.

The Bricklayer shall have the right to use all tools necessary to all of the above work operations, including but not limited to hand tools, power tools, electric and air hammers or chipping guns.

Cement or Concrete Block Laying - The laying of cement or concrete blocks or blocks of masonry material.

B.    Stonemasonry - Stonemasonry shall consist of laying all rip rap, rubble work, with or without mortar, setting all cut stone, marble, slate or stone work (meaning as to stone, any work manufactured from such foreign or domestic products as are specified and used in the interior or the exterior of buildings by architects, and customarily called "stone" in the trade). Cutting all shoddies, broken ashlar or random ashlar that

12

is roughly dressed upon the beds and joints, and range ashlar not over ten inches in height: the dressing of all jambs, corners and ringstones that are roughly dressed upon the beds. joints or reveals, and the cutting of a draft upon same for plumbing purposes only; and the cleaning. cutting of joints and pointing of stone work.

The erection. installation. plumbing, leveling. aligning, as well as, the installation of all parts and hardware. and the anchoring, bolting and welding of all natural stone when natural stone is installed in pre-cast. metal or glass curtain wall systems shall be the work of the Bricklayers and Allied Craftworkers.

The work of the stone masons on natural stone faced steel truss panels shall include but shall not be limited to the following:

1. All welding and/or bolting of the support steel to the building structure.

2. The unloading, rigging, hooking on, hoisting, signaling, tagging, setting and landing of the stone faced steel truss panels.

3. The final setting, including but not limited to plumbing, leveling and aligning.

4. All temporary and final welding and/or bolting of panel to panel connections, and panel to building structure connections.

5. The assembly, and setting up of all lifting mechanisms used to hoist or move such panels, including but not limited to hand derricks, electric and manual chain falls.

The work of the bricklayers and masons on natural stone uni-strut systems or similar

type grid systems shall include but shall not be limited to the following:

1. The installation of the stone support system, including the erection , plumbing, leveling. aligning. bolting. welding and anchoring.

2. All welding of stud bolts whether by stud gun or arc welding.

3. The installation of tubular steel, clip angles and other parts and/or connections, whether bolted or welded.

4. The installation, setting, shimming, landing, and anchoring of natural stone to all metal grid backup systems.

5. All final setting of natural stone, including but not limited to plumbing, leveling and aligning.

6. The installation of all miscellaneous hardware necessary to complete the system, regardless of the method of installation.

The fabrication and installation of limestone, granite or other prefabricated natural stone panels, when mounted to steel or aluminum framing or set on steel struts shall be the work of the members of the International Union of Bricklayers and Allied Craftworkers.

This is to apply to all work on buildings, sewers, bridges, railroads, bulkheads, breakwaters, jetties, or other public works, and to all kinds of stone, particularly to the product of the locality where the work is being done, and the same shall be considered stonemasonry.

13

CT 9696

Stonemasons shall have the right to use all tools which they consider necessary in the performance of their work.

C.  Artificial Masonry - The cutting, setting and pointing of cement blocks and all artificial stone and marble. either interior or exterior, when set by the usual custom of the stonemasons and marble setter.  All cement that is used for backing up external walls, the building of party walls, columns, girders, beams, floors, stairs and arches and all material substituted for the clay or natural stone products, and the cutting, setting and pointing of all precast concrete units regardless of size.

The erection and setting of fiberglass stone-faced wall panels, GFRC panels and units, and other lightweight artificial stone, when said operation is a direct set from the truck to the structure, including the installation of lugs and other supporting steel and hardware, the hooking on, signaling and securing, the plumbing and aligning, grouting, patching, caulking, anchoring, bolting, and welding.

D.  Cement Masonry - Laying cut, screeding and finishing of all cement. concrete, brown stone composition, mastic and gypsum materials, flash patching of all concrete floors, also for fireproofing, waterproofing, cement and composition base and vault lights.  The cutting of all cement and concrete for patching and finishing.  The bush hammering of all concrete when cast in place.  The operation of the cement gun, the nozzle and the finishing of all material applied by guns, also the operation of the cement floor finishing machines.

The grinding, chipping, fills, repairs and flash patching of all concrete floors, columns, walls, and ceilings, the application of epoxies and other substitute materials for concrete resurfacing, patching, and underlayment. and: the application of the retarder, the washing and finishing of all aggregate finish shall be the work of the cement finisher.

The cement mason shall have the right to use all tools necessary to complete his work, including, but limited to hand tools, power tools, electric and air hammers or chipping guns.

F.  Plastering - All exterior plastering, plain and ornamental when done with stucco, cement and lime mortars or patent materials, artificial marble work, when applied in plastic form, composition work in all its branches, the covering of all walls, ceilings, soffits, piers, columns, or any part of a construction of any sort when covered with any plastic material in the usual methods of plastering, is the work of the plasterer. The casting and sticking of all ornaments of plaster or plastic compositions, the cutting and filling of cracks. All cornices, molding, coves and bull noses shall be run in place on rods and white mortar screeds and with a regular mold and all substitutes of any kind, when applied in plastic form with a trowel, or substitute for same, is the work of the plasterer.

The plasterer shall have the right to use all tools necessary to complete his work, including, but not limited to hand tools, electric and air hammers or chipping guns.

Dryvit System - All work pertaining to the Dryvit and similar systems, including insulation board, primus adhesive, reinforcing fabric and all other materials, also whatever preparations it takes to perform said Dryvit system, shall be the

work of plaster men or members of the I.U.B.A.C. having the skill to perform said work.

I.    Pointing, Caulking, and Cleaning - Pointing, caulking and cleaning shall consist of the pointing, caulking, and cleaning of all types of masonry, caulking of all window frames encased in masonry on brick, stone or cement structures, including all grinding and cutting cut on such work and all sandblasting, steam cleaning and gunnite work. The caulking of all window frames or door frames encased on masonry or brick, stone, precast or cement structures shall be the work of the members of the International Union of Bricklayers and Allied Craftworkers.

The pointing, cleaning and weatherproofing of all buildings, grain elevators and chimneys built of stone, brick and concrete. It shall include all grinding and cutting out.

The preparation and mixing of all caulking shall be the work of the members of the International Union of Bricklayers and Allied Craftworkers.

The water blasting, or other type of cleaning and the application of all fireproofing materials in the interior of water tanks or chests, stacks, silos chimneys and turbines.

The application of all sand and cement coats, other substitute cement based materials, fireproofing materials whether troweled or rolled on all masonry, cement, precast, or concrete.

All epoxy injection work, whether poured by hand, pointed or injected by machine under pressure, on brick, stone, precast, cement and concrete.

The application of all chemicals and epoxy coatings, including plastic coatings that combine in a matrix material and artificial aggregates of all types, which form interior-exterior decorative non-structural finishes of wide imitative and artistic effect.

All exterior and interior cleaning of buildings, whether brick, stone, precast, cement or concrete, regardless of whether water, detergent, acid, restorer, or other substitute cleaning products are used.

The waterblasting or other cleaning procedure used to expose aggregate or to prepare masonry to receive a new finish, or to be performed in connection with the pointing or caulking of a building.

The tuckpointing of oakum and polyurethane rope or other backing material into joints and into expansion joints between the top of all cement block walls and steel ceiling decks or steel beams or concrete beams or around the perimeters of windows, doors or other areas to be caulked, and; the cleaning and/or preparation of any natural or synthetic, concrete, masonry, stone or stucco.

The Bricklayer and Allied Craftsman shall have the right to use all tools necessary to complete the above work, including but not limited to hand tools and power tools.

J. Refractory Work -

The Employer agrees to assign to employees all work which has been historically or traditionally assigned to members of the International Union of Bricklayers and Allied Craftworkers, including but not limited to: dipping, setting, buttering, bedding, handing, pointing, grouting, caulking, cutting, toothing, fitting, plumbing, aligning, laying,

15

CT9696

flagging, leveling, installation of gaskets and expansion joint material. grinding. vibrating. tamping, guniting. insulation. and spraying of all refractory materials. anchoring of all refractory materials by all means including bolting and welding. ceramic welding. removal and cleaning of masonry materials, to be reinstalled. final sandblasting of surfaces to receive additional refractory materials, installation of chemical coating, fireproofing, and membrane materials by any method required. surface spraying of all refractory materials, and cleaning of coke oven walls, chambers and flues. Temporary bracing in coke oven repairs shall be done by Employees represented by Bricklayers and Allied Craftworkers. in coordination with other trades.

Backfill and vibrating of all refractory materials with electrical vibrators. air vibrators or any other methods.

Use of the nozzle when the refractory materials are used in furnaces, boilers, stacks, breechings and vessels.

### ARTICLE XI
### WORK RULES

Section 1. A line must be pulled on two sides of all double unit walls eight (8) inches in thickness or over. Employer shall furnish all lines.

Section 2. No line shall be dropped before it is laid out and tooled unless job conditions delay the tooling. No mortar shall be spread ahead of the line and no line shall be raised more than one course at a time except to avoid obstructions. No employee shall work ahead of the line, except the employee on the leads and the employee of the trigging.

The trigging employee shall be permitted to lay three (3) courses above the line.

Section 3. No employee shall be required to build a wall higher than five (5) feet from the ground or scaffold, whichever applies. No scaffold shall be built more than four (4) feet six (6) inches higher than the preceding working level. The Employer shall furnish ladders or other access to all scaffolds.

Section 4. All shafts or dangerous places of similar character must be sheeted tight to the floor above and a floor below to insure the safety of the men employed in the same and no employee shall work in any shaft or opening where elevators or counterweights are running, except where there is a bank of elevators in which one non-running elevator and counterweight must intervene. This paragraph does not apply to patching work.

Section 5. All mortar tubs are to be raised at least eight (8) inches above ground area, on scaffolds and floor level.

Section 6. Wherever practical, any method or device may be used in the construction of masonry work, provided that such methods and devices fall within the work jurisdiction claimed by members of the International Union of Bricklayers and Allied Craftworkers and are not expressly covered in other parts of this Agreement.

Section 7. All special tools and lines shall be provided by the Employer.

Section 8. The Employer shall provide clean, covered potable drinking water containers with spigot and sanitary drinking cups. The water shall be kept iced from 8 a.m. to 4:30 p.m. from May 1 to September 1. From

16

September 1 to May 1, drinking water shall not be iced.

Section 9. Work rules for plastering work shall continue to be as follows:

(a) On plastering work, the Employer shall see that no gauging is made up later than thirty minutes of 12:00 and forty-five minutes of the regularly established quitting time. At no time shall a gauging be prepared before the preceding gauging is complete and especially no one shall prepare gauging for other than themselves except on cornice work.

(b) The plastering inside of a building shall be left straight with the rod and darby. These tools are to be furnished by the employer.

(c) Molding or covers of plaster walls shall be run with a regular mold properly screeded and run on rods. All noses must be properly screeded and run with a regular mold on rods.

(d) The finishing of plaster walls and ceilings cannot be done while the screeded cornices or covers with which they intersect are not in place.

(e) For plastering work all mortar boards shall not exceed four (4) feet X six (6) feet or an equivalent area and each gauging shall not be more than one and one-half (1-1/2) rods per man.

(f) There shall be no preference given to either white mortar hands or brown mortar hands in regards to working overtime or the regular work day.

(g) All plaster moldings or cornices, plasters or plaster paneling must be run in place and where cornices are ornamented proper beds must be made to secure same. All plaster capitals, bases, and molding if not ornamental, must be run on the job.

(h) Contractors shall furnish all screed rods, darbies and feather edges, which must be kept true and straight at all times.

(i) When plastering, the mortar boards shall be raised at least sixteen (16) inches from the scaffold or placed on barrels or stands.

(j) When working on bottoms all work shall be plastered at least one (1) foot above scaffold height. If necessary a foot scaffold not to extend one (1) foot in height shall be allowed for this purpose.

(k) All plasterers shall be allowed ten (10) minutes clean up time before the established quitting time in which to change clothes and clean their tools.

(l) All stands for bottom work shall be no less than thirty (30) inches in height.

(m) There shall be no spacing of plank on scaffolds used for scratch, brown or white coat.

(n) For any scaffold up to four (4) feet in height, on side walls only, a scaffold twenty (20) inches in width shall be allowed. Anything four (4) feet or over in height shall be at least four (4) ten inch planks wide.

(o) No employee shall use stilts or other so called convenience which are hazardous in the opinion of the Field Representative.

(p) It is agreed that the plaster work if sublet or subcontracted by the Employer, shall be given to a contractor who agrees to

17

CT9696

be bound by the terms of this Agreement. There shall be no lumping of work.

Section 10. Work rules for cement finishing work shall continue to be as follows:

(a) There must be one (1) cement mason on the laying. placing or finishing of all concrete. On the floors there shall be two cement masons or plasterers to do rodding. screeding and top dressing. This does not prohibit bricklayers and masons from being so employed providing they are qualified.

(b) There shall be three (3) men to pull any rod over twelve (12) feet in length up to sixteen (16) feet, and an additional man for every four (4) feet thereafter.

(c) There shall be no lost time during normal working hours for the cement mason while waiting for concrete to set for finishing. No man shall be sent home until the concrete has been properly finished in the opinion of the Employer.

Knee boards are to be used when hand troweling or floating all slabs.

(d) All cement masons shall be allowed ten (10) minutes clean-up time before the established quitting time in which to change clothes and clean their tools.

Section 11. (a) There shall be no more than two (2) competent men on each two-man swing scaffold, and each man shall be supplied with a safety line and belt, tied to a separate anchorage.

(b) The erection of all two-man swing scaffolds shall be supervised and inspected by men working on said scaffold.

Section 12. One (1) man shall get coffee and deliver it to others who will not leave their work station. This is to be considered a privilege and will be revoked for those abusing it after prior notice to the Field Representative.

Section 13. No employee shall contract by the unit, or lump work of any character, covered by our classification of work, or work for any person or persons contracting work by the unit, or lump work of any character, taken from general contractors, without furnishing material.

Section 14. Every journeyman shall tool off his own work.

Section 15. The line shall not be raised before it is laid.

Section 16. All scaffolds shall be a minimum of five (5) ten (10) inch planks wide unless otherwise specified in the Agreement

Section 17. In addition to a locker on the ground floor, the Employer shall provide a gang box or tool box on every fifth floor above the ground floor. Tools shall be stored in the ground floor locker over the weekend. Employers shall not be responsible for tools stored in a gang box or tool box over the weekend.

## ARTICLE XII

## INTERNATIONAL MASONRY INSTITUTE TRUST AND IMI APPRENTICESHIP TRUST

Section 1. Each Employer signatory hereto subscribes and agrees to be bound by the

18

Agreement and Declaration of Trust of the International Masonry Institute Trust (IMI), including the International Masonry Institute Apprenticeship Trust (IMI-AT).

Section 2. Each Employer agrees to pay to said Funds the amounts set forth in Schedule A. attached hereto for each hour worked by each bricklayer and mason, including apprentices, covered by this Agreement. Payment shall be reported and paid not sooner than the twenty-fifth day of the month following the month in which the work was performed along with the other contributions as provided in this Agreement.

Section 3. Failure to contribute to the Fund shall be a violation of this Agreement.

Section 4. Each Employer shall be required to employ a ratio of one (1) apprentice to seven (7) journeymen on the job when apprentices are available. When appropriate, a ratio of one (1) apprentice to three (3) journeymen may be employed.

The following percentages of journeymen's wage rates shall be paid to apprentices and the following fringe benefit contributions shall be made for hours worked by apprentices.

1st 750 hours 50% of journeymen wage rate
2nd 750 hours 55% of journeymen wage rate

Employers shall contribute to all the funds for which contributions are required by the Agreement, except the pension funds and the annuity fund for the first 1500 apprentice hours.

3rd 750 hours 60% of journeymen wage rate
4th 750 hours 70% of journeymen wage rate

Employers shall contribute to all the funds to which contributions are required by the Agreement, except the annuity fund for the next 1500 apprentice hours.

5th 750 hours 80% of journeymen wage rate
6th 750 hours 90% of journeymen wage rate

Employers shall be required to contribute to all the funds to which contributions are required by the terms of this Agreement for the last 1500 apprentice hours .

Section 5. All parties to this Agreement shall adhere to the apprenticeship rules and regulations and standards approved by IMI and the Connecticut State Apprenticeship Council. IMI shall register the training program and all apprentices under supervision of IMI with the Connecticut State Apprentice Council and secure certification of the apprenticeship program so that payment of apprentice wage rates and fringe contribution rates will be permitted under state and federal prevailing rates laws. Contributions to the apprenticeship fund shall not be required during any period that payment of apprentice wage rates and fringe contribution rates are not permitted under state and federal prevailing rates laws.

Section 6. The Committee shall cooperate with the Bureau of Apprenticeship, United States Department of Labor, Connecticut State Apprenticeship Council, Connecticut State Agencies and trade related industries in advancing the training skills of apprentices.

Section 7. The apprentice shall train in all branches of the trade. The apprentice supervisor shall make changes of the apprentices if he sees the apprentice is not getting a fair share of all branches of the trade. No apprentice shall be exploited by

19

CT9696

being used for continuous periods on such jobs as washing down, cutting on the saw and rubbing concrete. The apprentice shall work on washing down or cutting on the saw for not more than one (1) month each year for each operation.

## ARTICLE XIII
## INSURANCE

The Employer shall carry, on behalf of all employees covered under this Agreement, Workers' Compensation Insurance, through a carrier licensed to do business in the State of Connecticut, and shall make Unemployment Compensation payments as required by law. The Employer shall provide the Director or Field Representative of the Union with evidence of such coverages upon request.

## ARTICLE XIV
## STATE AND FEDERAL LAWS

It is assumed by the parties hereto that each provision of this Agreement is in conformity with all applicable laws of the United States and the State of Connecticut. Should it later be determined that it would be a violation of any legally effective Government or State order or statutes to comply with any provision or provisions of this Agreement, the parties hereto agree to renegotiate such provision or provisions of this Agreement for the purpose of making them conform to such laws or statutes so long as they shall remain effective and the other provisions of this Agreement shall not be affected thereby.

## ARTICLE XV
## WORK STOPPAGES

Section 1. It is agreed that there shall be no work stoppages during the term of this Agreement except for the following causes only, and only forty-eight (48) hours (weekends excluded) after notice from the Union has been received by the Employer and the Association which clearly states the Union's intention to strike for:

"Willful non-payment of wages and/or fringe benefit contributions as required by this Agreement for time actually worked by employees covered under this Agreement."

The notice required by this Section shall be by telegram, registered or certified mail, and shall be authorized and signed by the appropriate Field Representative.

Section 2. Any Employee(s) who loses wages when this Article XV is implemented, due to the Employer's failure to pay wages and/or fringe benefit contributions as provided in this agreement, shall be compensated for each hour lost up to two (2) work days, (sixteen (16) hours).

Section 3. Except as specifically provided in Section 1 above, there shall be no work stoppages, strikes, slowdowns or other interference with the progress of the work during the term of this Agreement.

## ARTICLE XVI
## GRIEVANCE AND ARBITRATION PROCEDURE

Section 1. A grievance shall be defined as any dispute arising between the parties concerning interpretation and/or application

20

of this Agreement during the term of this Agreement. The Union, the Employer, and/or the Association may file and process a grievance as provided herein.

Section 2. There shall be a Joint Arbitration Committee hereinafter referred to as the "Committee", made up of two representatives of the Association and two representatives of the Union which shall hear grievances referred to it by the Employer, the Association and/or the Union.

Any controversy arising out of this Agreement involving the interpretation of its terms and conditions shall be settled in accordance with the grievance procedure set forth in this Article. No grievance shall be recognized unless it is called to the attention of the Employer by the Union or to the attention of the Union by the Employer within five (5) days after the alleged violation is committed or within five (5) days after the party filing the grievance knew or should have known of the event giving rise to the grievance.

Section 3. All grievances between an employee or group of employees on the one hand and the Employer on the other shall be ·processed in accordance with the following procedures:

Step 1. The steward, within two (2) working days after the event giving rise to the grievance, shall first report the grievance to the Employer's representative and the District Council.

Step 2. If the grievance is not resolved in Step 1 above, the Field Representative, within two (2) working days after the occurrence which gave rise to the grievance, shall then discuss the grievance with the job

superintendent or an officer of the Employer in a further attempt to resolve the matter informally.

Step 3. If the grievance cannot be resolved in Step 2 above. the Field Representative shall send notice to the Employer and the Association within five (5) days after the occurrence which shall have given rise to the grievance requesting consideration by the Committee of the grievance. Such notice shall be by certified mail, return receipt requested, and must give the names of all parties involved, job site location and full particulars of the grievance including appropriate dates and ARTICLE(S) and Section(s) of this Agreement which the Union alleges have been violated.

Section 4. Either the Employer or the Association may submit a grievance for consideration by the Committee by sending notice to the Union requesting such consideration. Such notice shall be by certified mail, return receipt requested and shall give details of the grievance. A copy of any such notice by the Employer shall be sent to the Association.

Section 5. The Committee shall meet to consider the grievance within five (5) working days after the request for such consideration has been received by either the Association or the Union. The grievance shall be deemed settled and resolved in accordance with the majority vote of the Committee, and the Committee's decision shall be binding upon the parties to the grievance. When decisions are reached by the Joint Arbitration Committee, a time frame for compliance of such decision shall be established by the Committee. Upon failure to comply with the decision of the Joint Arbitration Committee, the parties are

21

CT9696

free to take whatever action they deem necessary toward implementation.

Section 6. In the event the Committee is deadlocked or is otherwise unable to resolve a grievance which involves the interpretation or application of specific provisions of this Agreement within three (3) days after it first meets or should have met, either the Association or the Union may submit the grievance to arbitration.

The parties shall thereupon either agree upon the selection of a neutral arbitrator or failing agreement, select a neutral arbitrator from among the following list. Each party shall alternately strike a name from the list and the last name remaining on the list shall be the selected neutral arbitrator:

James Conte
John Romanow
Jonathan Liebowitz
Harrison C. Warren
Francis Grasso

The first party to eliminate a name in the first arbitration under this procedure shall be the Union and the next elimination that of the Association and alternately thereafter. In the following arbitration case, the first elimination shall be that of the Association, and in succeeding cases the first elimination shall continue to alternate between the Union and the Association.

The decision of the Joint Arbitration Committee meeting with the neutral arbitrator shall be final and binding on the parties.

Section 7. If either party refuses to participate in the selection of an impartial umpire, the other party shall select such umpire.

Section 8. If either party fails to appear at an arbitration proceeding before an impartial umpire, the umpire shall proceed ex parte.

Section 9. Each party shall bear the costs of its appointed arbitrators. The costs of the neutral arbitrator and an arbitration proceedings hereunder shall be borne by the party found in violation of the contract.

Section 10. The time limits set forth herein shall be strictly adhered to but may be extended by written agreement between the Association and the Union. A grievance shall be considered as being determined against the party in violation of the time limits set forth herein.

Section 11. Nothing set forth herein shall require the Union to process any Union or employee grievance which in its opinion is without merit and no employee has the right to arbitrate a grievance which the Union deems without merit. The Association has the right to determine whether or not it shall represent or continue to represent Employers with respect to grievances filed hereunder.

## ARTICLE XVII
## FRINGE BENEFIT FUNDS

Section 1. Employers shall make contributions to following funds in the amounts specified in Schedule A attached to this Agreement and made a part hereof, for each hour worked by employees covered by this Agreement.

Zone A. Local Unions No. 1, 2, 6, 12, and 16.

International Health Fund
International Union Pension Fund
International Union Retirement Savings
 Plan (Annuity Fund)
International Masonry Institute, Apprentice
 and Training (IMI/AT)
International Masonry Institute

Zone B. Local Union No. 4.

International Health Fund
International Pension Fund
International Union Retirement Savings
 Plan (Annuity Fund)
International Masonry Institute, Apprentice
 and Training (IMI/AT)
International Masonry Institute

<u>Section 2</u>. Each Employer agrees to pay to the Funds listed for Zone A or Zone B. depending on the location of the project on which the employees are working, the required contribution rates for all hours worked by employees and apprentices. except only as specifically agreed above with respect to the first 3000 hours of apprentice training. An hour of work for which overtime or any other premium wage must be paid, shall be considered a single hour for this purpose.

<u>Section 3</u>. Not later than the 20th day following the month in which the hours of work were performed, each Employer shall submit to the Funds reports containing a complete list of the names of employees, social security numbers, and the number of hours worked by each employee during the previous month. In the event no employee worked during the previous month, the Employer shall submit a report attesting that no Employees worked and this will be the Employer's final report until that Employer has reportable hours in the future.

<u>Section 4</u>. If an Employer fails to make the required contributions to any Fund by the end of the month following the month in which the work was performed. the Employer shall be considered a Delinquent Employer for that Fund.

If so determined by the trustees of any Fund. Delinquent Employers shall pay to each Fund for which it is a Delinquent Employer interest charges at the rate of one and one-half percent computed on the entire sum owed each Fund for each thirty (30) day period or fraction thereof that it is a Delinquent Employer.

If so determined by the trustees of any Fund, since the failure of a delinquent Employer to remit timely payment of contributions imposes additional accounting, handling and administrative expenses upon each of the Funds, each delinquent Employer shall pay, as liquidated damages the sum of one dollar ($1) per employee per Fund, up to a total maximum payment of three ($3) per employee, for each thirty (30) day period or fraction thereof that the Employer is delinquent.

If so determined by the trustees of any Fund, an Employer whose check is returned for insufficient funds will be required to make payments by certified check for the next six months.

<u>Section 5.</u> The failure of any Employer to make the required reports and contributions to each Fund shall make the Employer liable (1) to each employee damaged by such failure for whatever benefits the employer and his or her beneficiaries were denied because of the Employer's failure to make the required reports and contributions and (2) for court costs and attorney's fees reasonably

23

necessary in collecting the contributions, provided however, that no Employer shall have any liability to any employee or beneficiary as set forth above, if the failure to pay the required contribution or any part thereof was the result of honest mistake or inadvertence.

Section 6. No combination of employer contributions to the pension and annuity funds shall exceed 25% of the hourly wage rate during the term of this Agreement. However, if the present 25% restriction is ultimately adjusted or lifted by the IRS during the term of this agreement, the negotiating parties will adjust or waive this clause accordingly.

Section 7. All fringe benefit funds to which Employer contributions are required by this Agreement shall be maintained at all times as jointly administered Taft-Hartley trust funds with an equal number of employer trustees and labor trustees, herein referred to as the "Trustees", with such powers and duties as may be provided from time to time by the applicable Trust Agreement. The Funds shall furnish to the Association and the Union copies of their respective annual audit reports and annual actuarial or consulting reports and information concerning contributions received or due as might be requested from time to time.

Section 7A. The following conditions shall apply to the Connecticut Bricklayers Pension Fund. There shall be three trustees appointed by the Union. A Union trustee shall not be a principal in the contracting business. Three trustees shall be appointed by the Association. The Association trustees shall be appointed from among the group of Employers who are signatory to this Agreement and who employ employees

covered by this Agreement and from among the Association executive staff.

Section 8. The Funds shall at all times be operated in conformance with applicable Federal and State laws and regulations, and shall be maintained as tax exempt trusts under provisions of the Internal Revenue Code and Employer contributions to said Fund shall at all times be deductible by the Employer for Federal incomes tax purposes. In the event that a Fund fails to retain approval as a tax exempt trust so that Employer contributions shall not be deductible as a business expense, the Employer shall not be liable to contribute to such Fund for hours worked during the period that the contribution is not deductible.

Section 9. At the discretion of the Fund's Trustees, an Employer determined to be delinquent in its payments as required herein may be held liable for all contributions due to the Fund and reasonable attorney's fees, court costs, audit fees and other expenses incurred incidental to collection of contributions due the Fund, including a reasonable rate of interest on contributions due. Appropriate payroll records of the Employer may be subject to audit by the Trustees or their authorized representative upon reasonable notice. The Trustees shall have all powers with respect to the audit of appropriate payroll records and the collection of delinquent contributions, interest, audit fees, attorney's fees and other expenses of collection as may be provided from time to time by the applicable Trust Agreement.

Section 10. Fringe Benefit Bond Requirement. If so determined by the trustees of a Fund, any Employer who has not been signatory to this agreement and any prior agreement for two (2) consecutive

24

years, or any Employer whose employees have been removed in accordance with Article XV, Section 1 of this Agreement, or who is or has been a delinquent Employer at any time within any twelve (12) month period shall be required to furnish a surety bond or cash deposit escrowed with the Trustees in a sufficient amount to protect a Fund, against the failure of the Employer to make any payment due currently or in the future under the terms of this Agreement.

The following procedures and amounts shall govern fringe benefit bonds:

a. The total amount of the bond or bonds to be posted or cash to be deposited shall equal 160 hours times the total of the contributions to the employee fringe benefit funds required by this Agreement for each employee employed by the Employer.

b. If at any time after a bond or bonds are posted or money is deposited, and the Employer's work force increases, the fund trustees may require a corresponding increase in bonding or money deposited.

c. If an Employer chooses to post one bond, it shall be in the name of the Bricklayers fringe benefit funds. The bond may not require as a condition of payment that the Employer be delinquent in contributions to all of the funds, but rather a pro-rata share of the bonded amount shall be collectable by any fund to which the Employer is delinquent in the payment of contributions.

If an Employer chooses to post a separate bond for each fund, the amount of each bond shall be computed in accordance with the method described above, and the total of the separate bonds shall equal the total amount required as stated in Section a.

If an Employer chooses to deposit a bank certified check or money order, said check or money order shall be made payable to the Bricklayers fringe benefit funds. The check or money order shall be cashed immediately and allocated in accordance with Section (a) to a non-interest bearing checking account.

d. If no delinquency occurs during the first 12 months after bonds are posted, the Fund Office will notify the Employer that the bonds may be canceled, or the entire amount of the money deposited, without interest, will be returned to the Employer.

e. If, during the time that bond(s) or cash is being held by the Funds, an Employer is delinquent more than once, the Funds shall have the right to:

1. On the due date of the second delinquent contribution, recover the amount of delinquency by taking action to collect on the bond or bonds posted or withdrawing from the monies deposited by the Employer, and

2. Notify the Employer that weekly payments by certified check will be required for the next six months, and

3. Require that a new bond or bonds be posted, or additional monies be deposited, to make-up for the amount collected or withdrawn under paragraph (a) of the Section.

f. If an Employer fails to provide or replenish a cash or surety bond as required by this policy, the trustees of any fund may write to the Employer requesting the bond. If the bond is not received in the fund office within 30 days after the fund's written request, the matter shall be referred to the

25

CT9696

Fringe Benefit Fund(s)' collection attorney(s) and treated as a delinquency, and the Employer will not be allowed to employ any bricklayers whatsoever in the jurisdiction of the Union until the delinquency has been eliminated.

Section 11. Nothing in this Agreement, any trust agreement for a fund to which contributions are required by this Agreement, a plan of benefits or any other document shall be construed to impose upon the Employer or other contributor any liability or obligation to contribute or make any other payments to any Fund toward the cost of benefits or the cost of administration or funding to the Plan beyond the obligation of the Employer to make contributions, provide any required bonding and pay the expenses of collection as specified in this Agreement. Except to the extent that the Association and the Union may participate in the selection of their respective trustees, neither the Association, nor the union nor any Employer shall be responsible for the operation or administration of the Funds. In no event shall the Association, the Union or any Employer be liable for any action or failure to act of any trustee. It is agreed and understood that this section shall serve as a defense to any allegation or course of action wrought by any individual or entity which might jeopardize the employer's or other contributor's position that its liability is strictly limited as stated herein. In no event shall the Employer be liable to make duplicate contributions to more than one Fund providing the same type of benefits.

## ARTICLE XVIII
### DUES CHECK-OFF

Section 1. During the term of this Agreement, and in accordance with the terms of an individual and voluntary written authorization for check off of union membership dues to be furnished to the Employer in a form as specified in Section 3 below, and permitted by law including the provisions of Section 302 (c) of the Labor-Management Relations Act, as amended, the Employer agrees to deduct once each week from the net pay of each employee covered by this Agreement, who signs said authorization, the sum which the Union has specified, or from time to time later specifies, in writing to the Employer as the dues for the Union and its International Union for each payroll hour worked by said employee during the week as part of the employee's membership dues in the Union, provided however, that no change in the amount of hourly dues shall take effect until after the Union shall have given the Association thirty (30) days' prior written notice thereof. Said deductions shall be made solely for each employee who is a member of the Local Union and who is working in the geographical jurisdiction of the District Council.

Section 2. The Union agrees to indemnify and save the Employer and the Association harmless against any and all claims, suits, or other forms of liability arising out of the Employers' participation in or performance of the provisions of this Article. The Union assumes full responsibility for the disposition of the monies so deducted once they have been paid to the Union.

26

## COMBINED WORKING DUES AND BACPAC CHECK-OFF AUTHORIZATION

I hereby authorize any of the various individual Employers who are signatory to a collective bargaining agreement with any Bricklayers & Allied Craftworkers Local Union, District Council, the International Union, or any other BAC affiliate, and by whom I may be employed during the term of such agreement, or any renewal or extension, or any subsequent agreement, to deduct from my wages and transmit monthly to said Union the sum which the Union has specified, or specifies from time to time, as the portion of my union dues to said Union, to the International Union, or to any other BAC affiliate, subject to check-off through procedures conforming to applicable law. This authorization shall be irrevocable for a period of one (1) year following the date it was signed or until the current applicable collective bargaining agreement expires, whichever occurs sooner. This authorization shall be automatically renewed from year to year, unless sixty (60) days prior to the termination or the annual renewal date I revoke this authorization by written notice to the Union and to the individual employer by whom I am employed.

I also hereby authorize the Employer (as described above) to deduct from my wages the sum of _____ for each hour paid and to transmit that amount in the manner prescribed by the Union to the Bricklayers & Allied Craftsmen Political Action Committee (BACPAC). This authorization is signed freely and voluntarily and not out of fear of reprisal, and on the understanding that BACPAC is engaged in a joint fund raising effort with Committee on Political Education of the American Federation of Labor & Congress of Industrial Organizations, that BACPAC will use the money contributed to that effort to make political contributions and expenditures in connection with federal, state and local elections, and this voluntary authorization may be revoked at any time by written notice to the Employer and BACPAC of a desire to do so.

* To authorize the deduction of both working dues and BACPAC contribution, please sign and date this form.

* To limit the authorization to the deduction of either the working dues or BACPAC contribution, please check the appropriate box, sign and date this form.

Date _____ , 19____

S o c i a l    S e c u r i t y No._____

Signature_____

## ARTICLE XIX
## BUILDING AND CONSTRUCTION ADVANCEMENT PROGRAM

The Building and Construction Advancement Program (BCAP), a division of the Associated General Contractors of Connecticut, Inc., (hereinafter referred to as the "Program" or "BCAP") has been established and organized to improve public relations; to improve the standards of the construction industry; to conduct education and training programs and to conduct any program for the benefit of the construction industry. The Program shall not conduct any anti-union or political activity.

The Employer agrees, commencing with the first payroll following the effective date of

27

this Agreement, to make payments of twenty ($.20) cents per hour to BCAP for each hour each employee covered by this Agreement works. Payments to AGC are due and payable on or before the twenty-fifth day of the month following the month during which the work was performed. All contributions shall be in such manner as AGC shall require.

If the Employer fails to make contributions to BCAP within the period required by AGC, the delinquent Employer shall be liable for all reasonable costs for collecting the payments due, including but not limited to reasonable attorney's fees and court costs, audit costs, a reasonable rate of interest on the outstanding balance due BCAP, and liquidated damages assessed by AGC as an "administrative fee". The Union shall incur no liability or responsibility for the collection of such contributions.

The Union agrees to propose that all the provisions in this Article XIX Building and Construction Advancement Program shall be included in every independent agreement. The Union further agrees that the total hourly economic cost (i.e. hourly payments required) including payments to the Association for companies covered under such independent agreements shall not be less than the total hourly economic cost for Employers covered under this Agreement. In the event the total hourly economic costs for Employers covered under this Agreement are greater than the total hourly economic costs for any employer covered under an independent agreement, all Employers covered under this Agreement shall have the option to equalize the total hourly economic cost as provided in such independent agreement but shall not thereby be relieved

from making payments to the AGC as provided in this Article XIX.

## ARTICLE XX
## MANAGEMENT PREROGATIVES

The Employer hereunder shall have full authority to manage the work, direct the work force, and decide all matters except to the extent he is specifically prohibited from doing so under this Agreement. All Employers reserve the sole right to employ and discharge whomsoever they choose, provided only that they do not discriminate against any employee for any reason, including union or concerted activities, union membership, and the reasons set forth in Article III, Equal Employment Opportunity.

## ARTICLE XXI
## SEVERABILITY

The obligations of the Employers bound by this Agreement shall be several and not joint, and the acts, omissions or violations of this Agreement by an Employer or any individual or entity, whether alleged or in fact, shall not be held against any other Employer or against the Association.

28

04/01/97    09:57    IN:    WATERBURY MASONEY + FOUNDATION
APR 01 '97   11:04 No.003 P.01

### ARTICLE XXII
### TERM OF AGREEMENT

93 CT-1

293462

This Agreement shall remain in full force and effect from April 1, 1996, through March 31, 1999, and shall renew itself annually thereafter unless either party shall have given written notice to the other party of its desire to terminate this Agreement and negotiate a successor agreement at least sixty (60) days prior to March 31, 1999 or any March 31 thereafter.

LABOR RELATIONS DIVISION, THE
ASSOCIATED GENERAL CONTRACTORS
OF CONNECTICUT, INC.,
a division of
CONNECTICUT CONSTRUCTION
INDUSTRIES ASSOCIATION, INC.

CONNECTICUT DISTRICT
COUNCIL, INTERNATIONAL
UNION OF BRICKLAYERS
AND ALLIED CRAFTWORKERS,
AFL-CIO

by _____

by _____

MASON CONTRACTORS ASSOCIATION OF CONNECTICUT

— Zone A —

by _____

Waterbury Masonry & Foundation Inc    Gina Guessera, President
Company Name                          Signature and Title

1162 Commercial Street    (860) 945-6612    (860) 945-6348
Address (Number and Street)    Phone Number  -  Fax Number

Watertown, CT  06795
City or Town    Zip

CT9b96

# SCHEDULE A
## BRICKLAYERS DISTRICT COUNCIL OF CONNECTICUT
## BUILDING AGREEMENT

ZONE A  Local Unions No. 1, 2, 6, 12, and 16

Total wage and fringe package:

| | | |
|---|---|---|
| 4/1 96 - 3/31/97 | $30.15 | (plus $.20 for Association Program) |
| 4/1/97 - 3/31/98 | $30.65 | (plus $.20 for Association Program) |
| 4/1/98 - 3/31/99 | $31.20 | (plus $.20 for Association Program) |

Wage Rates:

| Effective Date | Hourly Rate |
|---|---|
| 4/1/96-3/31/97 | $21.90 |
| 4/1/97-3/31/98 | $22.30 |
| 4/1/98-3/31/99 | $22.75 |

Employer Contributions:

International Health Fund
    4/1/96 - 3/31/99    $4.00

International Union Pension Fund
    4/1/96 - 3/31/99    $2.80  ($2.55 and $0.25)

International Union Retirement Savings Plan (Annuity Fund)
    4/1/96 - 3/31/99    $1.00

International Masonry Institute, Apprentice and Training Trust (IMI/AT)
    4/1/96 - 3/31/97    $0.30
    4/1/97 - 3/31/98    $0.40
    4/1/98 - 3/31/99    $0.50

International Masonry Institute Trust
    4/1/96 - 3/31/99    $0.15

Association Program
    4/1/96 - 3/31/99    $0.20

The total of the Connecticut District Council and the International dues deductions shall be equal to 3.25% of the total wage rate and fringe benefit contribution rate package. (See special agreement for Apprentices in Article XII.)

ZONE B Local Union No. 4

Total wage and fringe package:

| | | |
|---|---|---|
| 4/1/96-3/31/97 | $31.38 | (plus $.20 for Association Program) |
| 4/1/97-3/31/98 | $31.88 | (plus $.20 for Association Program) |
| 4/1/98-3/31/99 | $32.23 | (plus $.20 for Association Program) |

Wage Rates:

| | |
|---|---|
| 4/1/96-3/31/97 | $22.30 |
| 4/1/97-3/31/98 | $22.70 |
| 4/1/98-3/31/99 | $22.95 |

Employer Contributions

International Health Fund
        4/1/96 - 3/31/99        $4.00

International Pension Fund
        4/1/96 - 3/31/99        $1.50

International Union Retirement Savings Plan (Annuity Fund)
        4/1/96 - 3/31/99        $3.13

International Masonry Institute, Apprentice and Training Trust (IMI/AT)
        4/1/96 - 3/31/97        $0.30
        4/1/97 - 3/31/98        $0.40
        4/1/98 - 3/31/99        $0.50

International Masonry Institute Trust
        7/1/96 - 3/31/99        $0.15

Association Program
        4/1/96 - 3/31/99        $0.20

The total of the Connecticut District Council and the International dues deductions shall be equal to 3.25% of the total wage rate and fringe benefit contribution rate package.

(See special agreement for Apprentices in Article XII.)

31

Case 1:08-cv-00752-RMU    Document 1    Filed 04/30/2008    Page 1 of 2

JS-44
(Rev.1/95 DC)

**I (a) PLAINTIFFS**

JOHN FLYNN, et al.

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    11001
(EXCEPT IN U.S. PLAINTIFF CASES)

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Ira R. Mitzner (202) 420-2200
Dickstein Shapiro LLP
1825 Eye Street, N.W.
Washington, DC  20006

**DEFENDANTS**

WATERBURY MASONRY & FOUNDATION, INC

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

ATTORNEYS (IF KNOWN)

---

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

---

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

- ☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

- ☐ 151 Medicare Act

**Social Security:**
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

**Other Statutes**
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

○ **E. General Civil (Other)**    OR    ○ **F. Pro Se General Civil**

**Real Property**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**Personal Property**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**Bankruptcy**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**Property Rights**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**Federal Tax Suits**
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**Other Statutes**
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

Case 1:08-cv-00752-RMU     Document 1-3     Filed 04/30/2008     Page 2 of 2

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☒ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

ERISA - Complaint filed for recovery of delinquent contributions - 29 U.S.C. Sections 1002, 1132, 1145

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23   DEMAND $ _____   Check YES only if demanded in complaint   JURY DEMAND:   YES ☐   NO ☒

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE _____   SIGNATURE OF ATTORNEY OF RECORD _____

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.      COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT   (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.     CASE ASSIGNMENT AND NATURE OF SUIT:   The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

VI.     CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN FLYNN, et. al.,<br><br>               Plaintiffs,<br><br>               v.<br><br>WATERBURY MASONRY & FOUNDATION,<br>INC.,<br><br>               Defendant. | )<br>)<br>)<br>)<br>)<br>)    Civil Action No. 08-0752 (RMU)<br>)<br>)<br>)<br>)<br>)<br>) |

## LOCAL RULE 7(K) STATEMENT

Pursuant to Local Rule 7(k), the following persons are entitled to be served with orders, judgments and stipulations:

        Ira R. Mitzner, Esquire
        Dickstein Shapiro LLP
        1825 Eye Street, N.W.
        Washington, D.C.  20006-5403

        Waterbury Masonry & Foundation, Inc.
        120 Commerce Court
        Cheshire, CT 06410

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion for Default Judgment was served by first class mail, postage prepaid, this _29th_ day of August 2008, upon:

> Waterbury Masonry & Foundation, Inc.
> 120 Commerce Court
> Cheshire, CT 06410

Chanda Morgan

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN FLYNN, et. al., )
)
Plaintiffs, )
)
v. )    Civil Action No. 08-0752 (RMU)
)
WATERBURY MASONRY & FOUNDATION, )
INC., )
)
Defendant. )
)

## JUDGMENT

The Summons and Complaint in this action having been duly served on the above-named Defendant on May 6, 2008, and the time for said Defendant, Waterbury Masonry & Foundation, Inc. ("Waterbury Masonry"), to appear and defend herein having expired, and Defendant not having filed an Answer, and the Clerk having entered default, and the Plaintiffs having filed a declaration of a total amount due of $18,457.31 and Plaintiffs having moved for entry of judgment by default in that amount, it is hereby

ORDERED, ADJUDGED, AND DECREED that the final judgment in favor of Plaintiffs and against Defendant is hereby granted and ordered entered as the judgment in this action as follows:

1.     That Plaintiffs John Flynn, James Boland, Gerald O'Malley, Ken Lambert, Gerard Scarano. H. J. Bramlett, Eugene George, Paul Songer, William McConnell, Matthew Aquiline, Gregory R. Hess, Michael Schmerbeck, Vincent Delazzero, and Benjamin Capp, all of whom are Trustees of, and sue on behalf of, the Bricklayers & Trowel Trades International Pension Fund ("IPF"), 620 F Street N.W., 7th Floor, Washington, DC 20004, and Jim Allen,

Matthew Aquiline, Lon Best, James Boland, Ted Champ, Raymond Chapman, Vincent Delazzero, Bruce Dexter, John Flynn, Eugene George, Gregory Hess, Fred Kinateder, Dan Kwiatkowski, Ken Lambert, Santo Lanzafame, Dick Lauber, William McConnell, Edward Navarro, Gerald O'Malley, John Phillips, Charles Raso, Mark Rose, Kevin Ryan, Gerard Scarano, Michael Schmerbeck, Paul Songer, Joseph Speranza and Fred Vautour, all of whom are Trustees of, and sue on behalf of, the International Masonry Institute ("IMI"), 620 F Street N.W., 7th Floor, Washington, DC 20004, recover from Defendant, Waterbury Masonry & Foundation, Inc. ("Waterbury Masonry"), 120 Commerce Court, Cheshire, CT 06410, the amount due of $18,457.31;

2.    That Waterbury Masonry be directed to submit all monthly reports and contributions that may come due the Plaintiffs subsequent to the filing of this judgment;

3.    That Waterbury Masonry comply with its obligations to make timely and full contributions to the IPF and IMI; and

4.    That said judgment is without prejudice to the right of Plaintiffs to seek recovery of any past or future delinquencies, interest, damages and reasonable attorney's fees and costs that may be owing to the Plaintiffs from Waterbury Masonry.

ORDERED, ADJUDGED AND DECREED that Plaintiffs have execution therefor.

Dated: _____, 2008    _____
                                     Ricardo M. Urbina
                                     United States District Judge

2468965